

Doc#:  0700915087 Fee: $234.00
Eugene "Gene" Moore RHSP Fee:$10.00
Cook County Recorder of Deeds
Date: 01/09/2007 12:03 PM  Pg:  1 of 49

## DECLARATION OF CONDOMINIUM
## PURSUANT TO THE CONDOMINIUM
## PROPERTY ACT
### WELLINGTON & PULASKI CONDOMINIUM

This Declaration made and entered into this **8th** day of January, 2007, 3731 N. St. LOUIS, LLC, an Illinois Limited Liability Company, not individually (hereinafter sometimes referred to as the "Owner."

### WITNESSETH:

WHEREAS, the Owner is the owner in fee simple of certain real estate, hereinafter described, in the City of Chicago, Cook County, Illinois; and

WHEREAS, the Owner intends to and does hereby submit such real estate, together with all buildings, structures, improvements, and other permanent fixtures of whatsoever kind thereon, all rights and privileges belonging or in anywise pertaining thereto, and any and all easements appurtenant thereto to the provisions of the Illinois Condominium Property Act; and

WHEREAS, the Owner desires to establish certain rights and easements in, over, and on said real estate for the benefit of itself and all future owners of any part of said real estate, and any unit or units thereof or therein contained, and to provide for the harmonious, beneficial, and proper use and conduct of the real estate and all units; and

WHEREAS, the Owner desires and intends that the several Unit Owners, mortgagees, Occupants, and other Persons hereafter acquiring any interest in the Property shall at all times enjoy the benefits of and shall hold their interests subject to the rights, easements, privileges, and restrictions hereinafter set forth, all of which are declared to be in furtherance of a plan to promote and protect the cooperative aspect of the Property and are established for the purpose of enhancing and perfecting the value, desirability, and attractiveness of the Property.

NOW, THEREFORE, the Owner declares as follows:

1. Definitions. Certain words and terms used in this Declaration are defined as follows:

   a. Act — The Condominium Property Act of the State of Illinois, as amended from time to time.

   b. Association — The Association of all the Unit Owners acting pursuant to the Bylaws attached hereto as Exhibit C, through its duly elected Board.

   c. Board — The board of managers of the Association as constituted at any time and from time to time. In the event the Association is incorporated, the "Board" shall mean the Board of Directors of the incorporated Association.

   d. Buildings — All structures, attached or unattached, located on the Property, containing one or more Units.

   e. Bylaws — The Bylaws of the Association, which are attached hereto as Exhibit C.

| F | 234 | A |
|---|---|---|
| P | ΛΣ | P |
| T |  | V |
| I | 1-9-07 |  |

**PLAINTIFF'S EXHIBIT 1**

RECORDING FEE ___234—___

DATE _1-9-07_ COPIES _6_

OK BY ___ΛΣ___



Doc#: 0700915087 Fee: $234.00
Eugene "Gene" Moore RHSP Fee:$10.00
Cook County Recorder of Deeds
Date: 01/09/2007 12:03 PM Pg: 1 of 49

## DECLARATION OF CONDOMINIUM
### PURSUANT TO THE CONDOMINIUM
### PROPERTY ACT
### WELLINGTON & PULASKI CONDOMINIUM

This Declaration made and entered into this 8th day of January, 2007, 3731 N. St. LOUIS, LLC, an Illinois Limited Liability Company, not individually (hereinafter sometimes referred to as the "Owner."

### WITNESSETH:

WHEREAS, the Owner is the owner in fee simple of certain real estate, hereinafter described, in the City of Chicago, Cook County, Illinois; and

WHEREAS, the Owner intends to and does hereby submit such real estate, together with all buildings, structures, improvements, and other permanent fixtures of whatsoever kind thereon, all rights and privileges belonging or in anywise pertaining thereto, and any and all easements appurtenant thereto to the provisions of the Illinois Condominium Property Act; and

WHEREAS, the Owner desires to establish certain rights and easements in, over, and on said real estate for the benefit of itself and all future owners of any part of said real estate, and any unit or units thereof or therein contained, and to provide for the harmonious, beneficial, and proper use and conduct of the real estate and all units; and

WHEREAS, the Owner desires and intends that the several Unit Owners, mortgagees, Occupants, and other Persons hereafter acquiring any interest in the Property shall at all times enjoy the benefits of and shall hold their interests subject to the rights, easements, privileges, and restrictions hereinafter set forth, all of which are declared to be in furtherance of a plan to promote and protect the cooperative aspect of the Property and are established for the purpose of enhancing and perfecting the value, desirability, and attractiveness of the Property.

NOW, THEREFORE, the Owner declares as follows:

1.  Definitions. Certain words and terms used in this Declaration are defined as follows:

    a.  Act — The Condominium Property Act of the State of Illinois, as amended from time to time.

    b.  Association — The Association of all the Unit Owners acting pursuant to the Bylaws attached hereto as Exhibit C, through its duly elected Board.

    c.  Board — The board of managers of the Association as constituted at any time and from time to time. In the event the Association is incorporated, the "Board" shall mean the Board of Directors of the incorporated Association.

    d.  Buildings — All structures, attached or unattached, located on the Property, containing one or more Units.

    e.  Bylaws — The Bylaws of the Association, which are attached hereto as Exhibit C.

| F | 234 | A |
|---|-----|---|
| P | AE  | P |
| T |     | V |
| I | 1-9-07 | |

RECORDING FEE  234—
DATE 1-9-07 COPIES 6
OK BY  AE

f.   Common Elements — All portions of the Property except the Units, including, without limiting the generality of the foregoing, the Parcel, stairways, corridors, roofs, storage areas, laundries, mechanical rooms and equipment therein, refuse collection system, central heating system, and structural parts of the improvements on the Parcel, wherever located.

g.   Common Expenses — The proposed or actual expenses affecting the Property, including Reserves, if any, lawfully assessed by the Board.

h.   Condominium Instruments — All documents and authorized amendments thereto recorded pursuant to the provisions of the Act, including the Declaration, Bylaws, and Plat.

I.   Developer — 3731 N. St. LOUIS, LLC, an Illinois Limited Liability Company, and its successors and assigns, or such other Persons as the beneficiary of the Owner may from time to time designate. The Developer is the Developer of the Property as Developer is defined in the Act. For purposes hereof, any receiver or mortgagee in possession with respect to such entire interest shall be entitled to exercise all rights of Developer during the period of its receivership or possession as mortgagee in possession, or the case may be.

j.   First Mortgagee — An owner of a bona fide first mortgage or first trust deed covering any portion of the Property.

k.   Initial Board of Managers — The first Board, the majority of the members of which are Unit Owners other than the Developer.

l.   Limited Common Elements — That part of the Common Elements assigned by deed and/or serving a single Unit exclusively as an inseparable appurtenance thereto, including specifically such portions of the perimeter walls, floors and ceilings, windows and doors, and all fixtures and structures therein that lie outside the Unit boundaries, pipes, ducts, flues, shafts, electrical wiring or conduits, or other system or component part thereof that serve a Unit exclusively to the extent such system or component part is located outside the boundaries of a Unit.

m.   Maintenance Fund — All money collected or received by the Association pursuant to the provisions of the Condominium Instruments.

n.   Majority or Majority of Unit Owners — The owners of more than 50 percent in the aggregate in interest of the undivided ownership of the Common Elements. Any specified percentage of the Unit Owners means such percentage in the aggregate in interest of such undivided ownership.

o.   Occupant — A person or persons, other than a Unit Owner, in possession of a Unit.

p.   Parcel — The lot or lots or tract or tracts of land, described in Paragraph 2 hereof, submitted to the provisions of the Act.

q.   Person — A natural individual, corporation, partnership, trustee, or other legal entity capable of holding title to real property.

r.   Plat — A plat or plats of survey of the Parcel and of all Units in the Property submitted to the provisions of the Act, which shall consist of the three-dimensional, horizontal, and vertical delineation of all such Units and such other data as may be required by the Act.

s. Property — All land, property, and space comprising the Parcel, all improvements and structures erected, constructed, or contained therein or thereon, including the Building and all easements, rights, and appurtenances belonging thereto, and all fixtures and equipment intended for the mutual use, benefit, and enjoyment of the Unit Owners, submitted to the provisions of the Act.

t. Record; Recordation; Recording; Recorded — To record or have recorded in the Recorder's Office of Cook County, Illinois.

u. Reserves — Those sums paid by Unit Owners that are separately maintained by the Board for purposes specified by the Board or the Condominium Instruments.

v. Unit — Any part of the Property designed and intended for any type of independent use and designated on the Plat as a Unit.

w. Unit Owner — The Person or Persons whose estates or interests, individually or collectively, aggregate fee simple absolute ownership of a Unit and its appurtenant undivided ownership interest in the Common Elements.

2. **Legal Description of Parcel.** The Parcel hereby submitted to the provisions of the Act is legally described as follows:

**Lot 1 and 2 in Block 3 in Belmont Gardens, being a subdivision of part of the Northeast 1/4 of Section 27, Township 40 North, Range 13, East of the Third Principal Meridian, according to the plat thereof recorded June 18, 1913 as document number 5209764, in Cook County, Illinois.**

**Commonly known as 2954-58 North Pulaski Road and 4003-09 West Wellington Avenue, Chicago, Illinois 60641.**

**Permanent Index Nos. 13-27-221-029-0000**

3. **Description of Units.** All units are delineated on the Plat attached hereto as Exhibit D and made a part of this Declaration. The legal description of each Unit shall consist of the identifying number or symbol of such Unit as shown on the Plat. Said Units are legally described on Exhibit A attached hereto and made a part hereof.

4. **Use and Ownership of the Common Elements**

a. The use of the Common Elements, and the rights of the Unit Owners with respect thereto, shall be subject to and governed by the Act, the Condominium Instruments, and the rules and regulations of the Board. The Board shall have authority to lease, license, or grant concessions with respect to portions of the Common Elements other than the Limited Common Elements. All income derived by the Association from leases, licenses, concessions, or other sources shall be held and used for the benefit of the members of the Association, pursuant to the Condominium Instruments, and the rules and regulations of the Association.

b. Each Unit Owner shall own an undivided interest in the Common Elements, in the percentage set forth in Exhibit B, attached hereto and made a part hereof, as a tenant in common with all other Unit Owners. Such percentage is based on the Trustee's initial determination of relative values of the Units. Except for (1) portions of the Common Elements that have been assigned to the Unit Owners by the Board pursuant to the provisions of the Condominium Instruments, and (2) the Limited Common Elements, each Unit Owner and his agents, permitted Occupants, family members, and

invitees shall have the right to use the Common Elements for all purposes incident to the use and occupancy of his Unit as a place of residence and such other incidental uses permitted by the Condominium Instruments, which right shall be appurtenant to and run with his Unit. Each Unit Owner shall have the right to the exclusive use and possession of the Limited Common Elements contiguous to and serving only his Unit and the Limited Common Elements access to which is available only through his Unit. The right to the exclusive use and possession of the Limited Common Elements as aforesaid shall be appurtenant to and run with the Unit of such Unit Owner. Except as set forth in the preceding sentence, Limited Common Elements may not be transferred between or among Unit Owners.

5.   Encroachments and Easements.

a.   If any part of the Common Elements encroaches or shall hereafter encroach on any part of any Unit, or any part of any Unit encroaches or shall hereafter encroach on any part of the Common Elements, or any portion of any Unit encroaches on any part of any other Unit as a result of the construction, repair, reconstruction, settlement, or shifting of the Building, valid easements for the maintenance of such encroachment are hereby established and shall exist for the benefit of (1) the Unit Owner of the Unit so encroaching, or (2) all the Unit Owners with respect to the Common Elements so encroaching as long as all or any part of the Building containing such Unit or Common Elements so encroaching shall remain standing; provided, however, that after the date this Declaration is Recorded, a valid easement for an encroachment shall in no event be created in favor of any owner of a Unit other than the Trustee or the Developer or in favor of the owners of the Common Elements if such encroachment occurred due to the willful conduct of said owner or owners.

b.   The City of Chicago, Ameritech, Commonwealth Edison Company, Peoples Gas Company, and all other providers of public utility services serving the Property, and any Person providing cable television or other similar entertainment to the Property, are hereby granted the right to lay, construct, renew, replace, operate, and maintain conduits, cables, pipes, wires, transformers, switching apparati, and other equipment related to their service to the Property, into and through the Common Elements and the Units, where reasonably necessary, for the purposes of providing utility and entertainment services to the Property, as long as such grantees repair any damage to the Property resulting from an exercise of their rights hereunder. Subject to the terms of Paragraph 5©, the Developer or Association may hereafter grant other or additional easements for utility or entertainment purposes and for any other purposes including, but not limited to, such easements as may be required to construct, keep, and maintain improvements on the Common Elements for the benefit of the Property, over, under, along, and on any portion of said Common Elements, and each Unit Owner hereby grants the Developer and the Association an irrevocable power of attorney to execute, acknowledge, and Record for and in the name of such Unit Owner such instruments as may be necessary to effectuate the foregoing (provided that with respect to all easements granted hereby or pursuant hereto, no Unit Owner shall be deprived of, or be subjected to material interference with, the use of its Unit or any Limited Common Element appurtenant to its Unit, other than reasonably). Each mortgagee of a Unit shall be deemed to consent to and be subordinate to any easement hereafter granted pursuant to the provisions of this Subparagraph 5(b) and also grants such power of attorney to the Developer and the Association necessary to effectuate the foregoing.

c.   Upon approval by at least 67% of the Unit Owners, portions of the Common Elements may be dedicated to a public body for purposes of streets or utilities. Where such a dedication is made, nothing in the Act or any other law shall be construed to require that the real property taxes of every Unit must be paid prior to Recordation of the dedication. Upon approval by a Majority of the Unit Owners, an easement may be granted for the laying, maintenance, and repair of cable television cable. Upon approval by a Majority of the Unit Owners, an easement may be granted to a governmental body for construction, maintenance, and repair of a project for protection against water damage or

erosion. Any action pursuant to this Subparagraph 5© must be taken at a meeting of Unit Owners duly called for the purpose.

d.   The Developer, its contractors and subcontractors, and their respective agents and employees shall have an easement for ingress, egress, and access to and throughout the Property to perform, and as may be required in connection with, the construction and equipping of the improvements on the Parcel, which easement shall continue at the Developer's discretion for two (2) years following the date of the election of the Initial Board of Managers. In connection therewith, the Developer, its contractors and subcontractors, and their respective agents and employees shall have the right to take into and through and maintain on the Property all material and equipment required in connection with such construction and equipping, and to temporarily suspend operation of entrances, doors, corridors, and other Common Elements without liability to any Unit Owner or Occupant; provided, however, that at all times Unit Owners and Occupants shall have reasonable access to their respective Units and Limited Common Elements, and the Developer shall cause as little inconvenience to Unit Owners and Occupants as is reasonably possible under the circumstances. The Developer shall promptly repair any damage caused to the Common Elements or any Unit in connection with the exercise of its rights and easements under this Subparagraph 5d.

e.   Without limitation of the terms of Subparagraph 5d, the right of the Unit Owners to use and possess the Common Elements shall be subject to a blanket easement over the Common Elements in favor of the Developer, and its representatives, agents, associates, employees, contractors, subcontractors, tenants, successors, and assigns, for the purpose of (1) access and ingress to, and egress from, the Property, or any part thereof, (2) construction, installation, repair, replacement, and restoration of utilities and any other portion of the improvements thereon, including the right to restrict and regulate access to the Common Elements for the purposes of completing construction of the Common Elements or Units, and (3) the installation and maintenance of signs advertising the Units in the Property, and signs directing potential purchasers to the sales office and models erected in connection with the Units and for such purposes as described in Subparagraph 11b. The foregoing easements in favor of the Developer shall continue until such time as may be required by the Developer, in its sole discretion, to perform, construct, or equip Common Elements or Units, and to make certain modifications thereof, for two (2) years following the election of the Initial Board of Managers, at which time such easements shall cease and be of no further force and effect without the necessity of any further action.

f.   A blanket easement over the Property is hereby granted in favor of the Association for the purpose of exercising its rights and performing its duties under this Declaration. The authorized representatives of the Association or the Board, or of the manager or managing agent for the Property, and any suppliers of water, utility, or cable television or similar entertainment services to the Property shall be entitled to reasonable access to, over, and through the individual Units as may be required in connection with the operation, maintenance, repairs, or replacements of or to the Common Elements or any equipment, facilities, or fixtures affecting or serving other Units or the Common Elements, or to service and take readings of any utility meters located within a Unit.

6.   Pipes, etc. All pipes, wires, ducts, flues, chutes, conduits, public utility lines (to the outlets), and structural components located in or running through a Unit and serving more than one Unit or another Unit or serving, or extending into, the Common Elements, or any part thereof, shall be deemed part of the Common Elements but shall not be deemed to be Limited Common Elements. No Unit Owner may take any action that would interfere with the ability of the Association to repair, replace, or maintain said Common Elements as provided herein.

7.   Sale or Other Alienation.

The Condominium Association does not retain the right of first refusal.

8.   **Association.**

a.   The Developer, before the first annual meeting of Unit Owners, or the Association thereafter, may cause the formation of an Illinois not-for-profit corporation for the purpose of facilitating the administration and operation of the Property and to act as the Association.

b.   Whether or not the Association is incorporated,

(1)   each Unit Owner shall be a member of such Association, which membership shall terminate on the sale or other disposition by such member of his Unit, at which time the new Unit Owner shall automatically become a member therein;

(2)   the provisions of Exhibit C of this Declaration shall be adopted as the Bylaws of such Association;

(3)   the name of such Association shall be Wellington & Pulaski Condominium Association, or a similar name.

c.   Until the election of the Initial Board of Managers, the same rights, titles, powers, privileges, trusts, duties, and obligations vested in or imposed on the Board by the Act and this Declaration (including without limitation, the rights, powers, and privileges to promulgate rules and regulations relating to the Property) shall be held and performed and may be exercised by the Developer, who is hereby authorized to retain a building manager on behalf of the Association.

d.   Within sixty (60) days following the election of the Initial Board of Managers, the Developer shall deliver to the Board

(1)   All original documents as Recorded or filed pertaining to the Property, its administration, and the Association, such as this Declaration, Bylaws, articles of incorporation of the Association, other Condominium Instruments, annual reports, minutes, and rules and regulations, contracts, leases, or other agreements entered into by the Association. If any original documents are unavailable, a copy may be provided if certified by affidavit of the Developer, or an officer or agent of the Developer, as being a complete copy of the actual document Recorded or filed;

(2)   A detailed accounting by the Developer, setting forth the source and nature of receipts and expenditures in connection with the management, maintenance, and operation of the Property, copies of all insurance policies, and a list of any loans or advances to the Association that are outstanding;

(3)   Association funds, which shall have been segregated from any other money of the Developer;

(4)   A schedule of all real or personal property, equipment, and fixtures belonging to the Association, including documents transferring the Property, warranties, if any, for all real and personal property and equipment, deeds, title insurance policies, and all tax bills;

(5)   A list of all litigation, administrative action, and arbitration involving the Association, any notices of governmental bodies involving actions taken or that may be taken by the Association, engineering and architectural drawings and specifications as approved by any

governmental authority, all other documents filed with any other governmental authority, all governmental certificates, correspondence involving enforcement of any Association requirements, copies of any documents relating to disputes involving Unit Owners, and originals of all documents relating to everything listed in this subsection; and

(6)   Any contract, lease, or other agreement made prior to the election of the Initial Board of Mangers by or on behalf of the Association or the Unit Owners.

9.   Insurance, Repair, and Reconstruction.

a.   The Association shall acquire and pay for, out of the Maintenance Fund herein provided for, the following:

(1) Such insurance as the Association is required to obtain under the provisions of the Act and such other insurance as the Association deems advisable in the operation and for the protection of the Common Elements and the Units. The Association shall also comply with the insurance requirements of the Federal Home Loan Mortgage Corporation (FHLMC), the Federal National Mortgage Association (FNMA), the U.S. Department of Housing and Urban Development (HUD), the Federal Housing Authority (FHA), or the Veteran's Administration (VA) to the extent that (a) such agency is a mortgagee, assignee of a mortgagee, or an insurer or guarantor of a first mortgage with respect to any Unit and the Association is so notified thereof; and (b) such agency's requirements do not conflict with those contained in the Act. Any losses under such policies of insurance shall be payable, and all insurance proceeds recovered thereunder shall be applied and disbursed, in accordance with the provisions of this Declaration and the Act. Coverage hereunder shall include the Units, the Limited Common Elements, except as otherwise determined by the Board, and the Common Elements, other than the Limited Common Elements not excluded by the Board. This coverage shall not cover betterments or improvements to the Units installed by the Unit Owners except to the extent Paragraph 9c is applicable, in which event the Association may assess any increased premium against the Units of the affected Unit Owners.

"Common elements" for the purposes of this subparagraph includes fixtures initially installed by the Developer and located within the unfinished interior surfaces of the perimeter walls, floors, and ceilings of the individual Units. Common elements exclude floor, wall, and ceiling coverings. "Improvements and betterments" for the purposes of this subparagraph means all decorating, fixtures, and furnishings installed or added to and located within the boundaries of the Unit, including electrical fixtures, appliances, air conditioning and heating equipment, water heaters, and built-in cabinets installed by Unit Owners.

The Association may engage the services of any bank or trust company authorized to do business in Illinois to act as trustee or agent on behalf of the Association for the purpose of receiving and disbursing the insurance proceeds resulting from any loss, on such terms as the Association shall determine consistent with the provisions of this Declaration. In the event of any loss resulting in the destruction of the major portion of one or more Units occurring after the election of the Initial Board of Managers, the Association shall engage a corporate trustee as aforesaid upon the written demand of the mortgagee or owner of any Unit so destroyed. The fees of such corporate trustee shall be Common Expenses.

Each Unit Owner, other than the Developer, shall notify the Association in writing of any additions, alterations, or improvements to his Unit, and he or she shall be responsible for any deficiency in any insurance loss recovery resulting from his failure so to notify the Association. The Association shall use its reasonable efforts to obtain insurance on any such additions, alterations, or improvements if such Unit Owner requests it to do so and if such Unit Owner shall make arrangements satisfactory to the Association to reimburse it for any additional premiums attributable thereto; and in the absence of insurance on such additions, alterations, or improvements, the Association shall not be obligated to apply any insurance proceeds to restore the affected Unit to a condition better than the condition existing prior to the making of such additions, alterations, or improvements. All such policies of insurance shall contain standard mortgage clause endorsements in favor of the mortgagee of each Unit and shall provide that such policies shall not be terminated, canceled, or substantially modified without at least 30 days' prior written notice to the mortgagee of each Unit.

(2) Commercial general liability insurance against claims and liabilities arising in connection with the ownership, existence, use, or management of the Property in such limits as the Association shall deem desirable, provided that such limit shall not be less than $1,000,000 per occurrence for personal injury and/or property damage, with an additional $2,000,000 umbrella coverage insuring the Association, the members of the Board, the managing agent, if any, and their respective agents and employees and all persons acting as agents. The Developer and its employees, representatives, and agents must be included as additional insured parties in their capacities as a Unit Owner, member of the Board, manager, or officer of the Board, as appropriate. The Unit Owners must be included as additional insured parties but only for claims and liabilities arising in connection with the ownership, existence, use, or management of the Common Elements. Such policy shall provide that the insurance coverage shall not be canceled or substantially modified without at least 30 days' written notice to the Association.

(3) Such other forms of insurance as the Association shall elect to effect, including such Workers' Compensation insurance as may be necessary to comply with applicable laws.

(4) Fiduciary bond to protect against dishonest acts on the part of all officers, employees, or other Persons, including the managing agent and its employees, who control or disburse funds of the Association. Such bond shall name the Association as an insured or obligee and shall be in an amount at least equal to the maximum amount of coverage available to protect funds in the custody or the control of the Association or the management company, including Reserves. Any management company that is responsible for the funds held or administered by the Association must be covered by a bond for the maximum amount of coverage available to protect those funds. The Association has standing to make a loss claim against the insurance of the managing agent as a party covered under the insurance. In the event FHLMC, FNMA, HUD, FHA or VA is a mortgagee, the insurance shall be in an amount at least equal to 150% of the estimated annual Common Expenses, including Reserves, unless a higher amount is required by the FHLMC, FNMA, HUD, FHA, or VA, in which case the insurance shall be in the higher amount. Such insurance shall contain a waiver of defense based on the exclusion of persons who serve without compensation from the definition of "employee."

(5) Directors' and officers' liability coverage at a level deemed reasonable by the Board. The directors' and officers' coverage must extend to all contracts and other actions taken by the members of the Board and officers in their official capacities as members of the Board and officers, respectively, but this coverage shall exclude actions for which the directors are not

entitled to indemnification under the General Not For Profit Corporation Act of 1986 or the Condominium Instruments.

b.   Except as otherwise provided in this Declaration, premiums for all insurance obtained or maintained by the Association, and the cost of any appraisal that the Association deems advisable in connection with any insurance, shall be Common Expenses.

c.   Insurance policies procured pursuant to Paragraphs 9a(1) and 9a(2) must provide for the following:

(1) Each Unit Owner and Mortgagee is an insured person under the policy with respect to liability arising out of the Unit Owner's interest in the Common Elements or membership in the Association.

(2) The insurer waives its right to subrogation under the policy against any Unit Owner or members of the Unit Owner's household and against the Association and members of the Board.

(3) The Unit Owner waives his or her right to subrogation under the Association policy against the Association and the Board.

d.   The Association may, but shall not be required to, secure policies providing the following:

(1) with respect to the insurance provided for in Paragraph 9a(1), that the policy cannot be canceled, invalidated, or suspended on account of the conduct of any one or more individual Unit Owners; and

(2) with respect to the insurance provided for in Paragraph 9a(1), that the insurer shall not have the option to restore the Property if the Property is sold or removed from the provisions of the Act.

e.   Each Unit Owner shall be responsible for insurance coverage on the furnishings and other items of personal property belonging to a Unit Owner that are contained in a Unit or elsewhere in the Property, insurance on the betterments and improvements to the Unit Owner's Unit not insured pursuant to the provisions of Paragraph 9a(1), and insurance for his or her personal liability to the extent not covered by insurance maintained by the Association.

f.   Upon the cancellation of any policy of insurance that the Association is required to obtain hereunder, the Association shall notify each party insured thereunder of such cancellation.

g.   In the event of fire or other disaster, the insurance proceeds, if sufficient to reconstruct the Building, shall be applied to restore the Building to substantially the same condition in which it existed prior to the fire or other disaster, with each Unit and Common Element to have the same vertical and horizontal boundaries as before the fire or other disaster.

h.   If, in the event of fire or other disaster, the insurance proceeds are insufficient to restore the Building as set forth in the preceding subparagraph then:

(1) The Board shall call a meeting of Unit Owners to be held not later than the first to occur of (a) the expiration of 30 days after the final adjustment of the insurance claims or (b) the expiration of 90 days after the fire or other disaster that caused the damage.

(2) At such meeting, the Board shall present an estimate of the cost of repair or reconstruction, together with an estimate of the part thereof that must be raised by way of special assessment.

(3) The Building shall be restored and the proposed special assessment shall be levied only upon the vote of 75% of the Unit Owners.

(4) If the Unit Owners do not vote to restore the Building at the meeting provided for in Paragraph 9h(1) above, then the Board may, at its discretion, call another meeting or meetings of Unit Owners to reconsider the question. If 75% or more of the Unit Owners do not vote to restore the Building within 180 days after the fire or other disaster, then the Board may (but shall not be required to) Record a notice as permitted under the Act.

(5) If the Unit Owners do not vote to restore the Building under the provisions of this paragraph and the Board does not Record a notice as permitted under the Act, then the Unit Owners may, upon the affirmative vote of a Majority of Unit Owners voting at a meeting duly called for that purpose and with the consent of all First Mortgagees, authorize the President or Vice President and the Secretary or Assistant Secretary to execute and record an amendment to this Declaration for the purpose of withdrawing any portion of the Building so affected by such fire or other disaster from the Act. Upon the withdrawal of any Unit or portion thereof, the percentage of interest in the Common Elements appurtenant to such Unit shall be reallocated among the remaining Units on the basis of the relative percentage interest of the remaining Units. If only a portion of a Unit is withdrawn, the percentage of interest appurtenant to that Unit shall be reduced accordingly, on the basis of diminution of the market value of the Unit, as determined by the Board. The allocation of any insurance or other proceeds to any withdrawing or remaining Unit Owners shall be on an equitable basis that need not be a Unit's percentage of interest in the Common Elements.

Any insurance or other proceeds available in connection with the withdrawal of any portion of the Common Elements, not necessarily including the Limited Common Elements, shall be allocated on the basis of each Unit Owner's percentage of interest in the Common Elements. Any such proceeds available from the withdrawal of Limited Common Elements shall be distributed in accordance with the interests of those entitled to their use. Upon the withdrawal of any Unit or portion thereof, assessments attributable to the period after such withdrawal shall no longer be required for such withdrawn Unit or shall be equitably reduced to reflect such withdrawn portion.

I.    The Board may, in the case of a claim against insurance required to be obtained by the Association for damage to a Unit or the Common Elements, (1) pay the deductible amount as a Common Expense; (2) after notice and an opportunity for a hearing, assess the deductible amount against the Unit Owner(s) who caused the damage or from whose Unit(s) the damage or cause of loss originated; or (3) require the Unit Owner(s) of the Unit(s) affected to pay the deductible amount.

j.    If, at the time of a loss under a policy maintained by the Association, there is other

insurance in the name of a Unit Owner covering the same property covered by the policy maintained by the Association, the Association's policy is primary insurance.

k.  Any loss covered by the policy under Paragraph 9a(1) must be adjusted by and with the Association. The insurance proceeds for that loss must be payable to the Association or to an insurance trustee designated by the Association for that purpose. The insurance trustee or the Association must hold any insurance proceeds in trust for Unit Owners and Mortgagees as their interests may appear. The proceeds must be disbursed first for the repair or restoration of the damaged common elements, the bare walls, ceilings, and floors of the units, and then to any improvements and betterments the Association may insure. Unit owners are not entitled to receive any portion of the proceeds unless there is a surplus of proceeds after the Common Elements and Units have been completely repaired or restored or the Association has been terminated as trustee.

l.  Contractors and vendors (except public utilities) doing business with the Association under contracts exceeding $10,000 per year must provide certificates of insurance naming the Association, the Board, and its managing agent as additional insured parties.

m.  Any insurer defending a liability claim against the Association must notify the Association of the terms of the settlement no less than 10 days before settling the claim. The Association may not veto the settlement unless otherwise provided by contract or statute.

n.  The Unit Owners shall obtain insurance covering their personal liability and compensatory (but not consequential) damages to another Unit caused by the negligence of the Unit Owner or his or her guests, residents, or invitees, regardless of any negligence originating from the unit. The personal liability of a Unit Owner must include the deductible of the Unit Owner whose Unit was damaged, any damage not covered by insurance required by this Paragraph 9n, as well as the decorating, painting, wall and floor coverings, trim, appliances, equipment, and other furnishings. If the Unit Owner does not purchase or produce evidence of insurance requested by the Board, the Board may purchase the insurance coverage and charge the premium cost back to the Unit Owner. In no event is the Board liable to any person either with regard to its decision not to purchase the insurance or with regard to the timing of its purchase of the insurance or the amounts or types of coverages obtained.  The Association may require the commercial units to obtain commercial insurance coverage in reasonable amounts and coverages and naming the Association as an additional insured.  This (these) insurance policy (ies) shall be paid for by the owner of the commercial units insured.

10.  Separate Real Estate Taxes. It is understood that real estate taxes for the Parcel are to be separately taxed to each Unit Owner for his Unit and its corresponding percentage of ownership of the Common Elements, as provided in the Act. In the event that for any year such taxes are not separately taxed to each Unit Owner but are taxed on the Property as a whole, then the Association shall collect from each Unit Owner his proportionate share thereof in accordance with his respective percentage of ownership of the Common Elements, and such taxes levied on the Property as a whole shall be considered a Common Expense.

11.  Use and Occupancy of Units and Common Elements. The Units and Common Elements shall be occupied and used as follows:

a.  Other than those units designated as commercial on the Plat, no part of the Property shall be used for other than housing and the related common purposes for which the Property was designed. Each Unit, or any two or more adjoining Units used together, shall be used as a residence for a single

family or such other uses permitted by this Declaration and for no other purposes. That part of the Common Elements separating any two or more adjoining Units used together may be altered to afford ingress and egress to and from such adjoining units in accordance with the rules and regulations of the Association and on such conditions as shall reasonably be determined by the Association, provided that a Unit Owner intending to so alter the Common Elements as aforesaid shall notify the Association at least forty-five (45) days before the commencement of any such alteration.

b.   Other than those units designated as "commercial" on the Plat, no industry, business, trade, occupation, or profession of any kind, commercial, religious, educational, or otherwise, designed for profit, altruism, exploration, or otherwise, shall be conducted, maintained, or permitted on any part of the Property. No "For Sale" or "For Rent" signs, advertising, or other displays shall be maintained or permitted on any part of the Property except at such location and in such form as shall be determined by the Association. The right is reserved by the Trustee and the Developer or their agent or agents to place "For Sale" or "For Rent" signs on any unsold or unoccupied Units and on any part of the Common Elements, and the right is hereby given to any mortgagee who may become the owner of any Unit to place such signs on any Unit owned by such mortgagee. Subject to the limitations of Paragraphs 5d and 5e, the Trustee and the Developer shall be entitled to access, ingress, and egress to the Property as they shall deem necessary in connection with the sale of, or work in, the Building or any Unit. The Trustee and the Developer shall have the right to use any unsold Unit or Units as a model apartment or for sales or display purposes, to relocate the same from time to time, and to maintain on the Property, until the sale of the last Unit, all models, sales offices, and advertising signs or banners, if any, and lighting in connection therewith.

c.   There shall be no obstruction of the Common Elements, nor shall anything be stored in the Common Elements without the prior consent of the Association, except as herein expressly provided. Each Unit Owner shall be obligated to maintain and keep his own Unit and the Limited Common Elements appurtenant thereto in good, clean order and repair. The use and the covering of the interior surfaces of windows, whether by draperies, shades, or other items visible on the exterior of the Building, shall be subject to the rules and regulations of the Association.

d.   Nothing shall be done or kept in any Unit or in the Common Elements that will increase the rate of insurance on the Property without the prior written consent of the Association. No Unit Owner shall permit anything to be done or kept in his Unit or in the Common Elements that will result in the cancellation of any insurance maintained by the Association, or that would be in violation of any law. No waste shall be committed in the Common Elements.

e.   Other than those Units designated as "Commercial" on the Plat, Unit Owners shall not cause or permit anything to be hung or displayed on the outside of windows or placed on the outside walls of the Building, and no sign, awning, canopy, shutter, or radio, or television, or other antenna (except as installed as of the date this Declaration is recorded or except as thereafter installed by Developer or the Association) shall be affixed to or placed on the exterior walls or roof or any part thereof or on the Common Elements without the prior written consent of the Association. All through-wall air conditioners and sleeves in which said air conditioners are inserted, installed as of the date this Declaration is Recorded, may be maintained, removed, and replaced, and shall be repaired as necessary by the Unit Owner owning the Unit that such air conditioner and sleeve serve. No air conditioning unit of whatever type, other than those installed as of the date this Declaration is Recorded, or those thereafter installed by the Developer or the Association, may be installed without the prior written permission of the Association.

f.   No animals, livestock, fowl, or poultry of any kind shall be raised, bred, or kept in any Unit or in the Common Elements, except that household pets, other than dogs or cats, may be kept in Units, subject to rules and regulations adopted by the Association, which rule or regulation may

exclude any kind of pet by type or category, provided that permitted household pets are not kept, bred, or maintained for any commercial purpose; and provided further that any such authorized pet causing or creating a nuisance or unreasonable disturbance shall be permanently removed from the Property on three (3) days' written notice from the Association. Dogs or cats that are kept in Units as of the date this Declaration is Recorded and dogs and cats owned by grantees of the Trustee at the time Units are conveyed to such grantees may be kept in Units subject to the terms of this paragraph, but once the dog or cat dies or is otherwise no longer kept in a Unit, the Unit Owner owning the dog or cat may not replace it with another dog or cat unless otherwise allowed pursuant to rules and regulations of the Association.

g.   No noxious or offensive activity shall be carried on in any Unit or in the Common Elements, nor shall anything be done therein, either willfully or negligently, that may be or become an annoyance or nuisance to the other Unit Owners or occupants.

h.   Except as constructed or altered by or with the permission of the Developer or the Association, nothing shall be done in any Unit or in, on, or to the Common Elements that would impair the structural integrity, safety, or soundness of the Building, or that would structurally change the Building.

i.   No clothes, sheets, blankets, laundry, or other articles of any kind shall be hung out or exposed on any part of the Common Elements. The Common Elements shall be kept free and clear of rubbish, debris, and other unsightly materials.

j.   No benches, chairs, or other personal property shall be left on, nor shall any playing, lounging, or parking of baby carriages, playpens, bicycles, wagons, toys, or vehicles be permitted on, any part of the Common Elements without prior consent of and subject to any rules and regulations of the Association.

k.   Nothing shall be altered or constructed in or removed from the Common Elements except by or with the permission of the Developer at any time before the election of the Initial Board of Managers without the written consent of the Association.

l.   Each Unit Owner and the Association hereby waive and release any and all claims he or it may have against any other Unit Owner, the Association, members of the Board, the Developer, the Trustee, the beneficiaries of the Trustee, and their respective employees and agents for damage to the Common Elements, the Units, or any personal property located in the Units or Common Elements caused by fire or other casualty or any act or omission referred to in Paragraph 11m, to the extent that such damage is covered by fire or other form of hazard insurance.

m.   If the act or omission of a Unit Owner, or of a member of his family, a household pet, a guest, an occupant, or a visitor of such Unit Owner, shall cause damage to the Common Elements or to a Unit or Units owned by others, or maintenance, repairs, or replacements shall be required that would otherwise be at the Common Expense, then such Unit Owner shall pay for such damage and such maintenance, repairs, and replacements, as may be determined by the Association, to the extent such payment is not waived or released under the provisions of Paragraph 11l.

n.   Any release or waiver referred to in Paragraphs 11l and 11m hereof shall be valid only if such release or waiver does not affect the right of the insured under the applicable insurance policy to recover thereunder.

o.   No Unit Owner shall overload the electric wiring in the Building, or operate any machines, appliances, accessories, or equipment in such manner as to cause, in the judgment of the Association,

an unreasonable disturbance to others. Nor shall any Unit Owner connect any machine, appliance, accessory, or equipment to the heating system or plumbing system without the prior written consent of the Association.

p.  This Paragraph 11 shall not be construed to prevent or prohibit a Unit Owner from maintaining his personal professional library, keeping his personal business or professional records or accounts, handling his personal business or professional telephone calls, or conferring with business or professional associates, clients, or customers in his Unit.

q.  Each Unit Owner shall deposit with the Board duplicate keys for all locks required for entry to his Unit, as well as security codes for all alarm systems relating to entry to his Unit.

r.  Except as otherwise expressly provided in the Declaration of Condominium or Bylaws, no additions, alterations, or improvements shall be made by a Unit Owner to any part of the Common Elements (including the Limited Common Elements) and no additions, alterations, or improvements shall be made by a Unit Owner to his Unit, where such work alters the wall or partition, configuration, ceiling, perimeter doors or windows, or floor load or otherwise affects the structure of the Unit or the structural integrity or systems of the Building, or increases the cost of insurance required to be carried by the Board hereunder, without prior written consent of the Board, and then only in accordance with rules and regulations adopted by the Board. Any addition, alteration, or improvement of a Unit by the Unit Owner that shall affect the structure of the Unit or the Common Elements or shall affect the structural integrity of the Building shall, further, conform with all documentation prepared or reviewed and approved by an architectural or engineering firm selected by the Association. The cost of such drawings or review and approval shall be paid by the Unit Owner. The Board may (but shall not be required to) condition its consent to the making of an addition, alteration, or improvement by a Unit Owner on the Unit Owner's agreement either (1) to be solely responsible for the maintenance of such addition, alteration, or improvement, subject to such standards as the Board may from time to time set, or (2) to pay to the Association from time to time the additional costs of maintenance or insurance as a result of the addition, alteration, or improvement. If an addition, alteration, or improvement is made by a Unit Owner without the prior written consent of the Board, then the Board may, in its discretion, take any of the following actions, which actions shall not be exclusive of the remedies available to the Board under Paragraph 12 hereof:

(1)  Require the Unit Owner to remove the addition, alteration, or improvement and restore the Property to its original condition, all at the Unit Owner's expense, or

(2)  If the Unit Owner refuses or fails to properly perform the work required under clause (1) above, the Board may cause the work to be done and may charge the Unit Owner for the cost thereof as determined by the Board; or

(3)  Ratify the action taken by the Unit Owner, and the Board may (but shall not be obligated to) condition such ratification on the same conditions that it may impose on the giving of its prior consent under this subparagraph.

12.  Violation of Declaration. The violation of any rule or regulation adopted by the Association or the breach of any covenant or provision herein or in the Bylaws contained shall, in addition to any other rights provided for in this Declaration or the Bylaws, give the Association the right (a) to enter on the Unit or any portion of the Property on which, or as to which, such violation or breach exists, and to summarily abate and remove, at the expense of the defaulting Unit Owner, any structure, thing, or condition that may exist thereon contrary to the intent and meaning of the provisions hereof, and neither the Association, nor the officers, employees, or agents thereof, shall thereby be deemed guilty in any manner of trespass; or (b) to enjoin, abate, or remedy by appropriate legal proceedings, either

at law or in equity, the continuance of any breach; or © to take possession of such Unit Owner's interest in the Property and to maintain an action for possession of such Unit in the manner provided by law.

Provided, however, that, except in cases of emergency when damage to persons or property is threatened, the Association shall not take any such action unless (a) it has first given the Unit Owner alleged to have violated any restriction, condition, or regulation adopted by the Association, or to be in breach of any covenant or provision herein or in the Bylaws contained, a hearing on such allegations pursuant to rules and regulations adopted by the Association; (b) the Association shall have determined such allegations to be true; and © the Unit Owner shall not have desisted from such violation or breach or shall not have taken such steps as shall be necessary to correct such violation or breach within such reasonable period of time as determined by the Association and communicated to the Unit Owner. Any and all costs and expenses incurred by the Association in the exercise of its authority, as granted in this Paragraph 12, including but not limited to court costs, reasonable attorneys' fees as determined by a court of competent jurisdiction, and cost of labor and materials, shall be paid by the Unit Owner in violation and, until paid by such Unit Owner, shall constitute a lien on the interest of such Unit Owner in the Property, which lien may be perfected and foreclosed in the manner provided in §9 of the Act with respect to liens for failure to pay a share of the Common Expenses. Any such lien shall be junior and subordinated to the lien of a First Mortgagee with respect to such Unit.

Furthermore, if, after hearing and finding as aforesaid, the Unit Owner fails to desist from such violation or to take such corrective action as may be required, the Association shall have the power to issue to the defaulting Unit Owner a ten- (10-) day notice in writing to terminate the rights of the defaulting Unit Owner to continue as a Unit Owner and to continue to occupy, use, or control his Unit and the Common Elements appurtenant thereto, and thereupon an action in equity may be filed by the Association against the defaulting Unit Owner for an order declaring the termination of the defaulting Unit Owner's right to occupy, use, or control the Unit owned by him and the Common Elements appurtenant thereto, on account of the violation of a rule or breach of covenant or provision as aforesaid, and ordering that all the right, title, and interest of the Unit Owner in the Property shall be sold at a judicial sale on such notice and terms as the court shall establish, except that the court shall enjoin and restrain the defaulting Unit Owner from reacquiring his interest at such judicial sale or by virtue of the exercise of any right of redemption may be established, and except that the court shall direct that any mortgage of a First Mortgagee be retired out of the proceeds of such judicial sale. The proceeds of any such judicial sale shall first be paid to discharge court costs, reasonable attorneys' fees, and all other expenses of the proceeding and sale, and all such items shall be taxed against the defaulting Unit Owner in the order. Any balance of proceeds after satisfaction of such charges, and any unpaid assessments hereunder, or any liens in favor of a First Mortgagee, shall be paid to the Unit Owner. Upon the confirmation of such sale, the purchaser thereat shall thereupon be entitled to a deed to the Unit and, subject to the first right and option of the Association as provided in Paragraph 7e above, to immediate possession of the Unit sold and may apply to the court for an order of assistance for the purpose of acquiring such possession, and it shall be a condition of any such sale, and the order shall so provide, that the purchaser shall take the interest in the Property sold subject to this Declaration.

Any Unit Owner in default hereunder or under the provisions of the Bylaws or any rule or regulation adopted by the Association shall pay to the Association, as an agreed Common Expense with respect to his Unit, all attorneys' fees incurred by the Association in enforcing the provisions of the Bylaws, this Declaration, or the rules and regulations of the Association as to which the Unit Owner is in default. Until such fees are paid by the Unit Owner, the amount thereof shall constitute a lien on the interest of the Unit Owner in the Property, which lien may be perfected and foreclosed in the manner provided in §9 of the Act with respect to liens for failure to pay a share of the Common

Expenses. Any such lien shall be junior and subordinate to the lien of a First Mortgagee with respect to such Unit.

13.   Grantees. Each grantee of the Trustee, the Developer, or a subsequent Unit Owner, each purchaser under Articles of Agreement for Deed, and each tenant under a lease accepts the same subject to all easements, restrictions, conditions, covenants, reservations, liens, and charges, the Bylaws, the rules and regulations of the Association, and the jurisdiction, rights, and powers created or reserved by this Declaration and the provisions of the Act, as at any time amended, and all easements, rights, benefits, and privileges of every character hereby granted, created, reserved, or declared, and all impositions and obligations hereby imposed shall be deemed and taken to be covenants running with the land, and shall bind any Person having at any time any interest or estate in said land, and shall inure to the benefit of each grantee in like manner as though the provisions of this Declaration were recited and stipulated at length in each and every deed of conveyance.

14.   Failure To Enforce. No terms, obligations, covenants, conditions, restrictions, or provisions imposed hereby or contained herein shall be abrogated or waived by any failure to enforce them, no matter how many violations or breaches may occur.

15.   Notices. Whenever any notice is required to be given under the provisions of this Declaration or the Bylaws, a waiver thereof in writing by the Person or Persons entitled to such notice, whether before or at the time stated therein, shall be deemed equivalent to the giving of such notice, provided such waiver or the time of giving it is not contrary to the provisions of the Act. Notices required to be given to any devisee or personal representative of a deceased Unit Owner shall be delivered by mail to such party at his or its address appearing in the records of the court wherein the estate of such deceased owner is being administered.

16.   Amendments. Except as hereinafter otherwise provided, the provisions of Paragraphs 1, 2, 3, 4, 5, 6, 13, 24, and this Paragraph 16 of this Declaration may be amended, changed, or modified by an instrument in writing, setting forth such amendment, change, or modification, signed and acknowledged by all members of the Board, all of the Unit Owners, and each mortgagee having a bona fide lien of record against any Unit. Except as herein otherwise provided, other provisions of this Declaration may be amended, changed, or modified on a vote of a majority of the Board voting, and at least 75% of the Unit Owners, by an instrument in writing setting forth such amendment, change, or modification, signed and acknowledged by an authorized officer of the Board and containing an affidavit by an officer of the Association certifying that (a) at least 66²/₃% of the Unit Owners have approved such amendment, change, or modification, and (b) a copy of the amendment, change, or modification has been mailed by certified mail to all mortgagees having bona fide liens of Record against any Unit, not less than ten (10) days before the date of such affidavit. The approval of eligible First Mortgagees (i.e., First Mortgagees who have requested that the Association notify them of amendments affecting the matters described in (a) through and including (o) below) of 51% of Units that are subject to a mortgage or trust deed shall be required to materially amend any provisions of the Declaration or Bylaws or to add any material provisions thereto that establish, provide for, govern, or regulate any of the following:

a.   Voting;

b.   Increases in assessments that raise the previously assessed amount by more than 25%, assessment liens, or subordination of such liens;

c.   Reduction of Reserves for maintenance, repair, and replacement of the Common Elements;

d.   Insurance or fidelity bonds;

e.  Rights to use of the Common Elements;

f.  Responsibility for maintenance and repair of the Common Elements;

g.  The addition, annexation, or withdrawal of property to or from Wellington & Pulaski Condominium;

h.  Boundaries of any Unit;

I.  Interests in the Common Elements or Limited Common Elements;

j.  Convertibility of Units into Common Elements or of Common Elements into Units;

k.  Leasing of Units;

l.  Imposition of any right of first refusal or similar restriction on the right of a Unit Owner to sell, transfer, or otherwise convey his Unit in the condominium;

m.  Establishment of self-management by the Association when professional management has been required by FHLMC, FNMA, HUD, FHA, or VA.

n.  Hazard or fidelity insurance requirements; or

o.  Any provisions that expressly benefit mortgage holders, insurers, or guarantors.

Any amendment, change, or modification shall conform to the provisions of the Act and shall be effective on recordation thereof. No change, modification, or amendment that affects the rights, privileges, or obligations of the Trustee or the Developer shall be effective without the prior written consent of the Trustee or Developer. The Bylaws may be amended in accordance with the provisions of Article XII thereof.

17.  Arbitration. Any controversy between or among Unit Owners, or any claim by a Unit Owner against the Association, arising out of or relating to the Declaration, Bylaws, or rules and regulations of the Association in which the matter in controversy has either no specific monetary value or a value of $10,000 or less shall be settled by arbitration in accordance with the Rules of the Illinois Uniform Arbitration Act, with the disputants to share equally in the costs of arbitration.

18.  Intentionally left blank.

19.  Condemnation. In the event of a taking or condemnation by competent authority of any part of the Property, the Association shall, if necessary, restore the improvements on the remaining portion of the Property to conform as closely as possible to the general design, structure, and materials used with respect to the improvements as they existed before the taking or condemnation. In the event that part or all of one or more Units is taken or condemned, then the portions so taken or condemned shall be deemed to have been removed from the provisions of the Act, and the percentage of ownership interest in the Common Elements allocated to such Unit or portion thereof (as determined by the Board on the basis of diminution in market value of the Unit) shall be reallocated among the remaining Units on the basis of the relative percentage of ownership interests in the Common Elements of the remaining Units. In such cases, this Declaration and the Plat shall be amended accordingly, pursuant to the provisions of the Act. The allocation of any condemnation award or other proceeds to any withdrawing or remaining Unit Owner shall be on an equitable basis, which need not

be a Unit's percentage of interest in the Common Element. Any condemnation award or other proceeds available in connection with the withdrawal of any portion of the Common Elements, not necessarily including the Limited Common Elements, shall be allocated on the basis of each Unit Owner's percentage of interest in the Common Elements. Any such proceeds available from the withdrawal of Limited Common Elements shall be distributed in accordance with the interests of those entitled to their use. Upon the withdrawal of any Unit or portion thereof, the responsibility for the payment of assessments on such Unit or portion thereof so withdrawn shall cease or shall be equitably reduced.

20.    Violations of Certain Rules. If any of the options, privileges, covenants, or rights created by this Declaration shall be unlawful or void for violation of (a) the rule against perpetuities or some analogous statutory provision, (b) the rule restricting restraints on alienation, or © any other statutory or common law rules imposing time limits, then such provision shall continue only until twenty-one (21) years after the death of the survivor of the now living lawful descendants of George W. Bush, the now incumbent President of the United States, and Richard Chenney, the now incumbent Vice President of the United States.

21.    Severability. The invalidity of any restriction hereby imposed, or of any provision hereof, or of any part of such restriction or provision, shall not impair or affect in any manner the validity, enforceability, or effect of the rest of this Declaration, and all of the terms hereof are hereby declared to be severable.

22.    Construction. The provisions of this Declaration shall be liberally construed to effect its purpose of creating a uniform plan for the development and operation of a first-class condominium development.

23.    Changes or Modifications by the Developer. Until the election of the Initial Board of Managers, the Developer, or its successors or assigns, shall have the right to change or modify the Condominium Instruments, which change or modification shall be effective on the recording thereof, provided further that such right shall be exercised only (a) to bring the Declaration and Plat into compliance with the Act, (b) to correct clerical or typographical errors in the Declaration or Plat, or © to conform the Condominium Instruments to the requirements of FHLMC or the FNMA with respect to condominium projects. In furtherance of the foregoing, a power coupled with an interest is hereby reserved and granted to the Developer to make any change or modification as authorized hereunder on behalf of each Unit Owner as attorney in fact for such Unit Owner. Each deed, mortgage, trust deed, other evidence of obligation, or other instrument affecting a Unit and the acceptance thereof shall be deemed to be a grant and acknowledgment of, and a consent to the reservation of, the power to the Developer as aforesaid.

24.    Rights of First Mortgagees. Any mortgage or trust deed owned or held by a First Mortgagee and Recorded before the Recording or mailing of a notice by the Association of the amount owing by a Unit Owner who has refused or failed to pay his share of the monthly assessment when due shall be superior to the lien of such unpaid Common Expenses set forth in the notice and to all assessments for Common Expenses that become due and are unpaid subsequent to the date of Recording of such first mortgage or first trust deed. Any First Mortgagee who comes into possession of a Unit pursuant to the remedies provided in the mortgage or trust deed, foreclosure of the mortgage or trust deed, or deed (or assignment) in lieu of foreclosure, shall not be liable for and shall take the Unit and its proportionate interest in the Common Elements free from claims for unpaid common or special assessments levied by the Association that accrue before the date of possession as aforesaid.

a.    A First Mortgagee, or an insurer or guarantor of the note held by a First Mortgagee, on written request to the Association (such request to state the name and address of such First

Mortgagee, insurer, or guarantor and identification of the Unit encumbered by the mortgage held by such First Mortgagee), shall be entitled to timely written notice of

> (1)   Any proposed action that requires the consent of a specified percentage of eligible First Mortgagees;

> (2)   Any proposed termination of the condominium project;

> (3)   Any condemnation loss or any casualty loss that exceeds $10,000 and affects a portion of the Common Elements, or that exceeds $1,000 and affects any Unit on which there is a first mortgage held, insured, or guaranteed by such eligible holder;

> (4)   Any delinquency in the payment of assessments or charges owed by an owner of a Unit subject to the mortgage of a First Mortgagee, insurer, or guarantor, when such delinquency has continued for a period of 60 days; and

> (5)   Any lapse, cancellation, or material modification of any insurance policy or fidelity bond maintained by the Association.

b.   Any restoration or repair of the Property after a partial condemnation or damage due to an insurable hazard shall be substantially in accordance with the Declaration and the original plans and specifications for the Building unless the approval is obtained from at least 67% of the Unit Owners and the eligible First Mortgagees of Units that represent at least 51% of the Units subject to mortgages or trust deeds held by eligible First Mortgagees.

c.   Any election to terminate the condominium project after substantial destruction or substantial taking by condemnation of the Property shall require the approval of at least 67% of the Unit Owners and the eligible First Mortgagees of Units that represent at least 51% of the Units subject to mortgages or trust deeds held by eligible First Mortgagees.

d.   Any election to terminate the condominium project for reasons other than substantial destruction or condemnation of the Property shall require the approval of at least 67% of the Unit Owners and the eligible First Mortgagees of Units that represent at least 67% of Units subject to a mortgage or trust deed held by an eligible First Mortgagee.

25.   **Trustees.** In the event title to any Unit should be conveyed to a land trust under which all powers of management, operation, and control of the premises remain vested in the trust beneficiary or beneficiaries, then the trust estate under such trust and the beneficiaries thereunder from time to time shall be liable for payment of any obligation, lien, or indebtedness chargeable or created under this Declaration against such Unit. No claim shall be made against any such title holding trustee personally for payment of any claim, lien, or obligation hereby created, and the trustee shall not be obligated to sequester funds or trust property to apply in whole or in part against any such lien or obligation, but the amount thereof shall continue to be a charge or lien on the premises notwithstanding any transfer of beneficial interest or the title of such real estate.

IN WITNESS WHEREOF, the said Owner has caused its seal to be affixed hereunto and caused its name to be signed in these presents by its Manager.

3731 N. St. LOUIS, LLC

By _____
Manager

This instrument prepared by:

Carl P. Palladinetti
4024 W. Montrose Avenue
Chicago, Illinois 60641
(773) 685-9500

Please mail to:

Carl P. Palladinetti
4024 W. Montrose Avenue
Chicago, Illinois 60641

STATE OF ILLINOIS )
                 ) SS
COUNTY OF COOK )


I, the undersigned, a Notary Public in and for said County, in the state of aforesaid, do hereby certify that _CARL P. ZAGLADWSKI_ , a managing member of 3731 N. St. LOUIS, LLC an Illinois Limited Liability Company, and who is personally known to me to be the same person whose name is subscribed to the foregoing instrument as such Manager appeared before me this day in person and acknowledged that she/he signed and delivered the said instrument as her/his own free and voluntary act and as the free and voluntary act of said entity aforesaid, for the uses and purposes therein set forth.

Given under my hand and notarial seal this 8th day of January, 2007.

Notary Public

OFFICIAL SEAL
YOLANDA SANTOS
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 11-16-2008

CERTIFICATE

3731 N. St. LOUIS, LLC, (the "Developer") as developer of WELLINGTON &
PULASKI Condominium Association Inc., (the "Condominium") hereby certifies
that a copy of the notice of intent to submit certain real estate (the "real estate")
located at 2954-58 North Pulaski Road and 4003-09 West Wellington Avenue
Chicago, Illinois 60641 and legally described in the Declaration of Condominium
Ownership, Covenants, Conditions, Restrictions, and By-Laws for WELLINGTON
& PULASKI CONDOMINIUM ASSOCIATION, Inc., Chicago, Illinois to which
this Certificate is attached, to the Illinois Condominium Property Act, Ill. Rev. Stat.,
Chapter 30 (the "Act"), was not issued pursuant to Section 30 0f the Act since there
were no tenants in the building.

IN WITNESS WHEREOF, the undersigned has executed this Certificate dated
January 8 , 2005.

3731 N. St. LOUIS,  LLC

By x _____
        Manager

EXHIBIT A

Lot 1 and 2 in Block 3 in Belmont Gardens, being a subdivision of Part of the Northeast 1/4 of
Section 27, Township 40 North, Range 13, East of the Third Principal Meridian, according to the plat
thereof recorded June 18, 1913 as document number 5209764, in Cook County, Illinois.

COMMONLY KNOWN AS: 2954-58 North Pulaski Road and
4003-09 West Wellington Avenue
CHICAGO, ILLINOIS 60641

PERMANENT INDEX NUMBER(S): 13-27-221-029-0000

## EXHIBIT B

| Unit | Percentage of Ownership Interest in the Common Elements |
|------|-----------------------------------------------------|
| Commercial Unit 1 | 10.216 % |
| Commercial Unit 2 | 6.907 |
| Commercial Unit 3 | 6.355 |
| 4003-1 | 3.981 |
| 4005-1 | 3.655 |
| 4007-1 | 7.959 |
| 4009-1 | 8.669 |
| 2956-2 | 4.800 |
| 2958-2 | 4.951 |
| 4003-2 | 3.981 |
| 4005-2 | 3.655 |
| 4007-2 | 4.407 |
| 4009-2 | 4.335 |
| 2956-3 | 4.800 |
| 2958-3 | 4.951 |
| 4003-3 | 3.981 |
| 4005-3 | 3.655 |
| 4007-3 | 4.407 |
| 4009-3 | 4.335 |
| Total | 100.000 |

EXHIBIT C

BYLAWS OF

WELLINGTON & PULASKI
CONDOMINIUM ASSOCIATION, INC.

ARTICLE I
General Provisions

The Association is responsible for the overall administration of the Property through its duly elected Board. Whether or not incorporated, the Association shall have such powers, not inconsistent with the Act, as are now or may hereafter be granted by the General Not For Profit Corporation Act of the State of Illinois. The Association shall have and exercise all powers necessary or convenient to effect any or all of the purposes for which the Association is organized and to do every other act not inconsistent with law that may be appropriate to promote and attain the purposes set forth in the Act or the Condominium Instruments. All capitalized terms used but not defined herein that are defined in the Declaration of Condominium Pursuant to the Condominium Property Act — Wellington & Pulaski Condominium have the same meaning as ascribed to such terms in the Declaration.

ARTICLE II
Members

Section 1. Classes of Members, Membership, and Termination Thereof. The Association shall have one class of members. The designation of such class and the qualifications of the members of such class shall be as follows:

Each Unit Owner shall be a member of the Association, which membership shall terminate on the sale or other disposition of a member's Unit, at which time the new Unit Owner shall automatically become a member of the Association. Such termination shall not relieve or release any former Unit Owner from any liability or obligation incurred under or in any way connected with the condominium or the Association during the period of such ownership and membership in the Association. Furthermore, such termination shall not impair any rights or remedies that the Board or others may have against a former Unit Owner arising from, or in any way connected with, such ownership and membership and the covenants and obligations incident thereto. No certificates of stock or other certificates evidencing membership shall be issued by the Association.

Section 2. Votes and Voting Rights.

a.   Until the date of the first annual meeting of the members, as provided in Article III, Section 1, hereof, no member of the Association shall have the right to elect the members of the Board. All such members of the Board of Managers shall be appointed and shall hold office as provided in Article IV, Section 2, of these Bylaws.

Page 1 of 19

b.  Commencing with the date of the first annual meeting of the members, the total number of votes of all members shall be 100. Each member shall be entitled to the number of votes equal to his percentage ownership interest in the Common Elements (as defined in the Declaration) times 100 at the time any matter is submitted to a vote of the members.

c.  If a Unit is owned by more than one person, the voting rights with respect to such Unit shall not be divided, but shall be exercised as if the Unit Owner consisted of only one person in accordance with the proxy or other designation made by the persons constituting such Unit Owner. Any proxy must be executed in writing by the Unit Owner, or his duly authorized attorney in fact, must bear the date of execution, and shall become invalid 11 (eleven) months from the date of its execution. If only one of the persons constituting such Unit Owner is present, he shall be entitled to cast the votes allocated to the Unit. If more than one of the persons constituting such Unit Owner are present, the votes allocated to the Unit may be cast only in accordance with the agreement of a majority in interest of such persons. Agreement by a majority in interest of such persons shall be deemed to exist if any of the persons casts the votes allocated to such Unit without protest being made promptly to the person presiding over the meeting by any other persons constituting the Unit Owner.

d.  Any specified percentage of the members, whether majority or otherwise, for purposes of voting or for any other purpose, wherever provided in these Bylaws, shall mean such percentage of the total number of votes hereinabove set forth. Such percentage shall be computed in the same manner as is a specified percentage of the Unit Owners of the Condominium as provided in the Declaration, provided, however, that when 30% or fewer of the Units, by number, possess over 50% in the aggregate of the votes as provided herein, any percentage vote of the members specified herein or in the Declaration shall require the specified percentage by number of Units rather than by percentage of interest in the Common Elements allocated to Units that would otherwise be applicable.

Section 3.   Transfer of Membership. Membership in this Association is not transferable or assignable, except as provided in Article II, Section 1, hereof.

Section 4. Installment Contracts. Anything herein to the contrary notwithstanding, in the event of a sale of a Unit, the purchaser of such Unit pursuant to an installment contract for purchase from a seller other than the Trustee or Developer shall, during such times as he resides in the Unit, be counted toward a quorum for purpose of election of members of the Board at any meeting of the Unit Owners called for the purpose of electing members of the Board and have the right to vote for the election of members of the Board and to be elected to and serve on the Board, unless the seller expressly retains in writing any or all of such rights. In no event may both the seller and purchaser be counted toward a quorum, be permitted to vote for a particular office, or be elected to serve on the Board. Satisfactory evidence of the existence and terms of the installment contract as they relate to the subject matter of this Section shall be made available to the Association or its agents. "Installment Contract" shall have the same meaning as set forth in Section 1(e) of the Dwelling Unit Installment Contract Act, 765 ILCS 75/0.01, *et seq.*, approved August 11, 1967, as amended.

ARTICLE III
Meetings of Members

Page 2 of 19

Section 1. Annual Meeting. The first annual meeting of the members shall be held on such date as is fixed by the Developer, which date shall in no event be later than the earlier of (a) three years from the date the Declaration is Recorded, (b) sixty (60) days from the date when 75% of the Units have been conveyed by the Trustee, or (c) such earlier time as selected by the Developer. Thereafter, an annual meeting of the members for the purpose of electing Board members and for the transaction of such other business as may come before the meeting shall be held in the month of September each year, provided, however, that no such meeting need be held less than one year after the first annual meeting of the members. If the election of members of the Board shall not be held when designated herein for any annual meeting, or at any adjournment thereof, the Board shall cause the election to be held at a special meeting of the members called as soon thereafter as it conveniently may be held. In the event the Developer fails to call the first annual meeting of members by the latest date set forth above, 20% of the members may call the first annual meeting by filing a petition to such effect with the Developer, setting forth a date for such meeting. After the filing of such petition, the members filing the petition may send notice of the first annual meeting of members as provided herein and may hold such meeting pursuant to the notice. The Board may disseminate to the members biographical and background information about candidates for election to the Board if reasonable efforts are made to identify all candidates and all candidates are given an opportunity to include biographical information and background material in the information to be disseminated and the Board does not express a preference in favor of any candidate. A Unit Owner shall be entitled to receive from the Board or the Developer acting as the Board as provided herein and in the Act, within three working days after the request therefor, the names, addresses, and weighted vote of each Unit Owner entitled to vote at the next annual meeting of members.

Section 2.   Special Meetings. Special meetings of the members may be called by the Board, the President, or not less than 20% of the members. All matters to be considered at special meetings of the members called by not less than 20% of the members shall first be submitted in writing to the Board not less than ten (10) days before the date of the special meeting of the members called to consider such matters.

Section 3.   Place and Time of Meeting. All meetings of the members shall take place at 8:00 p.m., in some section of the Property designated by the person or persons calling the meeting, or at such other reasonable place or time designated by the Board or the person or persons calling the meeting.

Section 4.   Notice of Meetings. Written or printed notice stating the purpose, place, day, and hour of any meeting of members shall be mailed or delivered to each member entitled to vote at such meeting not less than ten (10), nor more than thirty (30), days before the date of such meeting, by or at the direction of the President or the Secretary, or the officer or persons calling the meeting, except that notice of the first annual meeting of the members shall be given to the members at least twenty-one (21) days prior thereto. The notice of a meeting shall be deemed mailed when deposited in the United States mail addressed to the member at his address as it appears on the records of the Association, with proper postage thereon prepaid.

Section 5.   Quorum. The members present at a meeting in person or by proxy holding 20% of the votes that may be cast at any meeting shall constitute a quorum at such meeting. If a quorum is not present at the commencement of any meeting of members, the meeting shall be adjourned and may be called again only in accordance with the provisions of these Bylaws.

Page 3 of 19

Section 6.   Proxies. At any meeting of members, a member entitled to vote may vote either in person or by proxy, executed in writing by the member or by his duly authorized attorney in fact. No proxy shall be valid after 11 months from the date of its execution. Any proxy distributed by the Board for election of members of the Board shall give Unit Owners the opportunity to designate any person as the proxy holder and shall give the Unit Owner the opportunity to express a preference for any of the known candidates for the Board or to write in a name.

Section 7.   Manner of Acting. Except as set forth below, and except as otherwise required by the Declaration or the Act, any action to be taken at any meeting of the members at which a quorum is present shall be on the affirmative vote of more than 50% of the members represented at such meeting. The following matters shall require the affirmative vote of 67% or more of all the Unit Owners at a meeting duly called for that purpose:

    a.   Merger or consolidation of the Association;

    b.   Sale, lease, exchange, or other disposition of all, or substantially all, of the property and assets of the Association; or

    c.   The purchase and sale of land or Units on behalf of the Unit Owners.

## ARTICLE IV
### Board

Section 1. In General. The affairs of the Association shall be managed by the Board, which shall act as the Board of Managers of the Condominium as provided in the Act and the Declaration.

Section 2. Number, Tenure, and Qualifications. The number of members of the Board shall initially be three. Until the date of the first annual meeting of the members as hereinabove provided, members of the Board shall be the directors named in the Articles of Incorporation of the Association if the Association is incorporated; otherwise, the members of the Board shall be as appointed by the Developer. Such members of the Board shall hold office until the first annual meeting of the members. Commencing with the date of the first annual meeting of the members, members of the Board shall be elected solely by, from, and among, the members of the Association for a term of one year and until their respective successors shall have been elected and qualified. All members of the Board shall be elected at large. Each member of the Board shall hold office without compensation. In the event that a member of the Association is a corporation, partnership, trust, or other legal entity other than a natural person or persons, then any shareholder, officer, or director of such corporation, partner of such partnership, beneficiary or individual trustee of such trust, or manager of such other legal entity may be eligible to serve as a member of the Board. If there are multiple owners of a single Unit, only one of the multiple owners shall be eligible to serve as a member of the Board at any one time. A member of the Board may succeed himself in office.

Section 3. Election. At each annual meeting of the members, the members shall be entitled to vote on a cumulative basis, and the candidates receiving the highest number of votes with respect to the number of offices to be filled shall be deemed to be elected. A candidate for election to the

Board or such candidate's representative shall have the right to be present at the counting of the ballots at such election. The Board may disseminate to Unit Owners biographical and background information about candidates for election to the Board if (a) no preference is expressed in favor of any candidate and (b) reasonable efforts to identify all candidates are made and all candidates are given an opportunity to include biographical and background information in the information to be disseminated.

Section 4. Regular Meetings. A regular annual meeting of the Board shall be held immediately after and at the same place as the annual meeting of members. The Board shall, by regulations that the Board may from time to time adopt, provide the time and place for the holding of additional regular meetings of the Board, provided that the Board shall meet at least four times per year.

Section 5. Special Meetings. Special meetings of the Board may be called by or at the request of the President or 25% of the members of the Board. The person or persons permitted to call special meetings of the Board may fix the time and place for holding any special meeting of the Board called by them.

Section 6. Notice. Written notice of any special meeting of the Board shall be mailed or delivered to all members of the Association and all members of the Board not calling the meeting at least 48 hours before the date of such special meeting. Written notice of regular meetings of the Board shall be mailed or delivered to all members of the Association at least 48 hours before the date of such meeting. All such notices shall be deemed to be mailed when deposited in the United States mail addressed to each member at his address as it appears on the records of the Association, with proper postage thereon prepaid. The business to be transacted at or the purpose of any regular or special meeting of the Board shall be specified in the notice. Notices of a regular meeting of the Board need not be served on members of the Board. However, copies of notices of meetings of the Board shall be posted in entranceways or other conspicuous places in the condominium designated by the Board at least 48 hours before the meeting.

Section 7. Quorum. A majority of the members of the Board shall constitute a quorum for the transaction of business at any meeting of the Board. If less than a majority of the members of the Board are present at the commencement of the meeting, the meeting shall be adjourned and may be called again only in accordance with the provisions of these Bylaws.

Section 8. Manner of Acting. The act of a majority of the members of the Board present at the meeting at which a quorum is present at the commencement of the meeting shall be the act of the Board, except when otherwise provided by law or in the Condominium Instruments.

Section 9. Vacancies. Any vacancy occurring in the Board by reason of death, removal, or resignation of a member of the Board shall be filled by the two-thirds vote of the remaining members of the Board. A member elected by the Board to fill a vacancy shall serve until the next meeting of the members; provided that if a petition is filed with the Board signed by members holding 20% of the votes of the Association requesting a meeting of the members to fill the vacancy for the balance of the unexpired term of office of his predecessor, the term of the member so elected by the Board shall terminate 30 days after the filing of the petition, and a meeting of the members for the purpose of filling such vacancy for such unexpired term shall be called no later than 30 days following the filing of such petition. Members of the Board,

Page 5 of 19

including those appointed by the Developer, may resign at any time by written resignation delivered or mailed to any officer of the Association, which resignation shall be effective on receipt of said resignation. If, as a result of the death, removal, or resignation of a member of the Board, no member of the Board remains in office, a special meeting of members may be called to fill all vacancies for the unexpired terms of the members of the Board.

Section 10. Removal. From and after the date of the first annual meeting of the members, any member of the Board may be removed from office by the affirmative vote of 66⅔% of all the members of the Association at a special meeting called for such purpose.

Section 11. Adoption of Rules and Regulations. All rules and regulations, or amendments thereto, shall be adopted by the Board after a meeting of the members called for the specific purpose of discussing the proposed rules and regulations, notice of which contains the full text of the proposed rules and regulations, which rules and regulations conform to the requirements of the Act and the Declaration and these Bylaws. No quorum is required at such meeting of the members. No rules or regulations may impair any rights guaranteed by the First Amendment to the Constitution of the United State or Section 4 of Article I of the Illinois Constitution. Such rules and regulations shall be effective sixty (60) days after their adoption, provided that the members may veto the rule or regulation at a special meeting of the members called for such purpose and held before the effective date of the rule or regulation, by a vote 66⅔% of all the members of the Association.

Section 12. Open Meetings. All meetings of the Board, whether regular or special, shall be open to the members of the Association, except for meetings

a.   to discuss litigation when an action against or on behalf of the Association has been filed and is pending in a court or administrative tribunal, or when the Board finds that such an action is probable or imminent;

b.   to consider information regarding appointment, employment, or dismissal of an employee; or

c.   to discuss violations of rules and regulations of the Association, or a Member's unpaid share of Common Expenses.

Any vote on the above matters shall be taken at a meeting, or portion thereof, open to any member. Any member may record the proceedings at meetings required to be open by the Act or these Bylaws by tape, film, or other means, subject to reasonable rules and regulations prescribed by the Board to govern the right to make such recordings.

Section 13. Contracts. The Board may not enter into a contract with a current Board member or with a corporation or partnership in which a Board member or a Board member's family has a twenty-five percent (25%) or more interest unless notice of intent to enter the contract is given to Unit Owners within twenty (20) days after a decision is made to enter into the contract and the Unit Owners are afforded an opportunity by filing a petition, signed by twenty percent (20%) of the Unit Owners, for an election to approve or disapprove the contract. Such petition shall be filed within twenty (20) days after such notice, and such election shall be held within thirty (30)

days after filing the petition. For purposes of this Section 13, a Board member's immediate family means the Board member's spouse, parents, and children.

Section 14. Powers and Duties. The powers and duties of the Board shall include, but not be limited to, the operation, care, upkeep, maintenance, replacement, and improvement of the Common Elements. However, nothing in the foregoing sentence shall be deemed to invalidate any provision in the Condominium Instruments placing limits on expenditures for capital additions or capital improvements to the Common Elements (other than for purposes of repairing, replacing, or restoring portions of the Common Elements) by the Board without the prior approval of the Unit Owners.

Section 15. Board's Determination Binding. In the event of any dispute or disagreement between any Unit Owners relating to the Property, or any question of interpretation or application of the provisions of the Declaration, the rules and regulations, or the Bylaws, the determination thereof by the Board shall, absent manifest error, be final and binding on each and all of such Unit Owners.

At each annual meeting of the Unit Owners, the Unit Owners shall elect the entire board for the forthcoming year. In all elections for the members of the Board, the three candidates receiving the highest number of votes shall be deemed elected. Members of the Board shall serve without compensation for a term of one (1) year and until their successors are elected.

ARTICLE V
Officers

Section 1. Officers. The officers of the Association shall be a President, one or more Vice Presidents (the number thereof to be determined by the Board), a Treasurer, and a Secretary.

Section 2. Election and Term of Office. The President, Secretary, and Treasurer of the Association shall be elected annually by the Board at the first regular meeting of the Board held after the annual meeting of the members from among the members of the Board. The Vice President or Vice Presidents shall be elected annually by the Board at the first regular meeting of the Board held after the annual meeting of the members from among the membership of the Association. If the election of officers shall not be held at this meeting, the election shall be held as soon thereafter as conveniently may be possible. Vacancies may be filled or new offices created and filled at any meeting of the Board. Each officer shall hold office until the officer's successor shall have been duly elected and shall have qualified. An officer may succeed himself in office. Officers shall serve without compensation.

Section 3. Removal. Any officer elected by the Board may be removed by a majority vote of the members of the Board.

Section 4. Vacancies. A vacancy in any office because of death, resignation, removal, disqualification, or otherwise may be filled by the Board for the unexpired portion of the term of the member of the Board no longer serving.

Section 5. President. The President shall be the principal executive officer of the Association and shall in general supervise and control all of the business and affairs of the Association. The

President shall preside at all meetings of the members and of the Board. The President may sign, with the Secretary or any other proper officer of the Association authorized by the Board, any deeds, mortgages, contracts, or other instruments the Board has authorized to be executed, and any amendment to the Declaration or Plat as provided in the Act, and, in general, shall perform all duties incident to the office of President, and such other duties as may be prescribed by the Board from time to time.

Section 6. Vice President. In the absence of the President, or in the event of the President's inability or refusal to act, the Vice President (or in the event there be more than one Vice President, the Vice Presidents, in order of their election) shall perform the duties of the President and, when so acting, shall have all the powers of and be subject to all the restrictions on the President. Any Vice President shall perform such other duties as from time to time may be assigned by the President or by the Board.

Section 7. Treasurer. The Treasurer shall have charge and custody of and be responsible for all funds and securities of the Association; receive and give receipts for money due and payable to the Association from any source whatsoever, and deposit all such money in the name of the Association in those banks, trust companies, or other depositaries as shall be selected in accordance with the provisions of Article VII of these Bylaws; and in general perform all the duties incident to the office of Treasurer and such other duties as from time to time may be assigned to the Treasurer by the President or by the Board.

Section 8. Secretary. The Secretary shall keep the minutes of the meetings of the members and of the Board in one or more books provided for that purpose; see that all notices are duly given in accordance with the provisions of these Bylaws or as required by law; receive all notices on behalf of the Association; together with the President, execute on behalf of the Association amendments to the Condominium Instruments and other documents as required or permitted by the Declaration, these Bylaws, or the Act; be custodian of the records and, if the Association is incorporated, of the seal of the Association and, if the Association is incorporated, see that the seal of the Association is affixed to all documents, the execution of which on behalf of the Association under its seal is duly authorized in accordance with the provisions of these Bylaws; and in general perform all duties incident to the office of Secretary and such other duties as from time to time may be assigned to the Secretary by the President or by the Board.

ARTICLE VI
Powers and Duties of the Association and Board

Section 1. General Duties, Powers, etc., of the Board. The Board shall exercise for the Association all powers, duties, and authority vested in the Association by the Act and the Condominium Instruments, including but not limited to the following:

a.   Operation, care, upkeep, maintenance, replacement, and improvement of the Common Elements to the extent the operation, care, upkeep, maintenance, replacement, and improvement of Limited Common Elements is not imposed on Unit Owners hereunder.

b.   Preparation, adoption, and distribution of the annual budget for the Property.

c.   Levying and expending of assessments.

d.  Collection of assessments from Unit Owners.

e.  Employment and dismissal of the personnel necessary or advisable for the maintenance and operation of the Common Elements.

f.  Obtaining adequate and appropriate kinds of insurance.

g.  Owning, conveying, encumbering, leasing, and otherwise dealing with Units and land conveyed to or purchased by it.

h.  Adoption and amendment of rules and regulations covering the details of the operation and use of the Property, but no such rule or regulation shall make improper or legal any program or activity of the Developer that immediately prior to the adoption or amendment of the rule or regulation was otherwise proper or legal hereunder.

I.  Keeping of detailed, accurate records of the receipts and expenditures affecting the use and operation of the Property.

j.  Having access to each Unit, from time to time, as may be necessary for the maintenance, repair, or replacement of any Common Elements therein or accessible therefrom, or for making emergency repairs therein necessary to prevent damage to the Common Elements or to another Unit or Units.

k.  Borrowing money at such rates of interest as it may determine, issuing its notes, bonds, and other obligations to evidence such borrowing, and securing any of its obligations by making a mortgage or giving a security interest in all or any of its property or income.

l.  Paying real estate property taxes, special assessments, and any other special taxes or charges of the State of Illinois or of any political subdivision thereof or other lawful taxing or assessing body, that are authorized by law to be assessed and levied on the real property of the condominium (other than assessments on Units not owned by the Association).

m.  Imposing charges for late payments of a Unit Owner's proportionate share of the Common Expense, or any other expenses lawfully agreed on, and after notice and an opportunity to be heard, levying reasonable fines for violation of the Declaration, Bylaws, and rules and regulations of the Association.

n.  Assigning its rights to future income, including the right to receive Common Expenses assessments.

o.  Recording the dedication of a portion of the Common Elements to a public body for use, as, or in connection with, a street or utility, when authorized by the members under the provisions of Paragraph 5c of the Declaration.

p.  Recording the granting of an easement for the laying of cable television cable when authorized by the members under the provisions of Paragraph 5c of the Declaration.

Page 9 of 19

q. Recording the grant of an easement for construction, maintenance, or repair of a project for protection against water damage or erosion.

r. Making reasonable accommodation of the needs of handicapped Unit Owners, as required by the Human Rights Act, in the exercise of its powers with respect to the use of the Common Elements or approval of modification in an individual Unit.

In the performance of their duties, the officers and members of the Board shall exercise, whether appointed by the Developer or elected by the members, the care required of a fiduciary of the members.

Section 2. Specific Powers and Duties. Anything herein contained to the contrary notwithstanding, the Association shall have the following powers:

a. To engage the services of a manager or managing agent, who may be any person, firm, or corporation, on such terms and compensation as the Association deems fit, and to remove such manager or managing agent at any time, provided any agreement with such manager or managing agent shall extend for not more than three years and must be terminable by either party to such agreement without cause and without payment of a termination fee, on ninety (90) days' or less prior written notice.

b. To engage the services of any person (including, but not limited to, accountants and attorneys) deemed necessary by the Association at such compensation as is deemed reasonable by the Association, in the operation, repair, maintenance, and management of the Property, or in connection with any duty, responsibility, or right of the Association and to remove, at any time, any such personnel.

c. To establish or maintain one or more bank accounts for the deposit of any funds paid to or received by the Association.

d. To invest any funds of the Association in certificates of deposit, money market funds, or comparable investments.

e. Upon authorization of a two-thirds vote of the members of the Board, or by affirmative vote of not less than a majority of the Unit Owners at a meeting duly called for such purpose, acting on behalf of all Unit Owners, to seek relief from or in connection with the assessment or levy of any real property taxes, special assessments, or charges of the State of Illinois or any political subdivision thereof or of any lawful taxing or assessing body, and to charge and collect all expenses incurred in connection therewith as Common Expenses.

Nothing herein contained shall be construed to give the Association authority to conduct an active business for profit on behalf of all the Unit Owners or any of them. The granting of licenses, leases, or concessions as provided in Paragraph 4 of the Declaration shall not be considered conducting an active business for profit.

Section 3. Authorized Expenditures. The Association shall acquire and make arrangements for, and pay for out of the Maintenance Fund, in addition to the manager, managing agent, or other personnel above provided for, the following:

a.  Water, waste removal, heating, electricity, telephone, or other necessary utility services for the Common Elements and such services to the Units as are not separately metered or charged to the owners thereof.

b.  Such insurance as the Association is required or permitted to obtain as provided in the Declaration.

c.  Landscaping, gardening, snow removal, painting, cleaning, tuckpointing, maintaining, decorating, repairing, and replacing portions of the Common Elements (but not including the Limited Common Elements, which the Unit Owners enjoying the use thereof shall paint, clean, decorate, maintain, and repair) and such furnishings and equipment for the Common Elements as the Association shall determine are necessary and proper, and the Association shall have the exclusive right and duty to acquire the same for the Common Elements. Anything in the foregoing to the contrary notwithstanding, and except when the need for repair or replacement is due to the act or omission of a Unit Owner, guest, occupant, family member, or pet, the Association shall be responsible for the repair and replacement (and cleaning of the exterior surfaces) of all windows.

d.  Any other materials, supplies, furniture, labor, services, maintenance, repairs, structural alterations, or assessments that the Association deems necessary or proper for the maintenance and operation of the Property or for the enforcement of any restrictions or provisions contained herein.

e.  Any amount necessary to discharge any mechanics lien or other encumbrance levied against the Property or any part thereof that may in the opinion of the Association constitute a lien against the Property or against the Common Elements rather than merely against the interest therein of particular Unit Owners. When one or more Unit Owners are responsible for the existence of such lien, they shall be jointly and severally liable for the cost of discharging it, and any costs incurred by the Association by reason of said lien or liens shall be specially assessed to said Unit Owners and shall, until paid by such Unit Owners, constitute a lien on the interest of such Unit Owners in the Property, which lien may be perfected and foreclosed in the manner provided in §9 of the Act with respect to liens for failure to pay a share of the Common Expenses.

f.  Maintenance and repair of any Unit or any other portion of the Property that a Unit Owner is obligated to maintain or repair under the terms hereof, if such maintenance or repair is necessary, in the discretion of the Association, to protect the Common Elements or any other portion of the Property, and the owner of said Unit has failed or refused to perform the maintenance or repair within a reasonable time after written notice of the necessity of the maintenance or repair is delivered by the Association to the Unit Owner; provided that the Association shall levy a special assessment against such Unit Owner for the cost of the maintenance or repair, and the amount of such special assessment shall constitute a lien on the interest of such Unit Owner in the Property, which lien may be perfected and foreclosed in the manner provided in §9 of the Act with respect to liens for failure to pay a share of the Common Expenses.

g.  Maintenance and repair (including payment of real estate taxes and common expenses) with respect to any Unit owned by the Association.

h.   If, due to the act or neglect of a Unit Owner or of a member of its family or household pet or of a guest or other authorized Occupant or visitor of such Unit Owner, damage shall be caused to the Common Elements or to a Unit or Units owned by others, or maintenance, repairs or replacements shall be required that would otherwise be a Common Expense, the assessment against such Unit Owner of a charge for such damage and such maintenance, repairs, and replacements as may be determined by the Board, to the extent not covered by insurance, and the amount of such special assessment shall constitute a lien on the interest of such Unit Owner in the Property, which lien may be perfected and foreclosed in the manner provided in §9 of the Act with respect to liens for failure to pay a share of the Common Expenses.

All expenses, charges, and costs of the maintenance, repair, or replacement of the Common Elements, and any other expenses, charges, or costs that the Association may incur or expend pursuant hereto, shall be approved by the Association, and a written memorandum thereof prepared and signed by the Treasurer. There shall be no structural alterations to, capital additions to, or capital improvements on the Common Elements or property owned by the Association (other than for purposes of repairing, replacing, and restoring existing portions of the Common Elements) requiring an expenditure in excess of Five Thousand Dollars ($5,000) without the prior approval of 67 percent of the Unit Owners. Separate or special assessments for additions or alterations to the Common Elements or to Association-owned property not included in an Annual Budget (defined in Article VI, Section 4, of the Bylaws) are subject to the approval of 67 percent of the Unit Owners.

As used herein, the term "repairing, replacing, and restoring" means to repair, replace, or restore deteriorated or damaged portions of the then-existing decorating, facilities , structural or mechanical components, interior or exterior surfaces, or energy systems and equipment to their functional equivalent prior to the deterioration or damage. In the event the replacement of a Common Element may result in an improvement over the quality of such Common Element as originally designed, the Board may provide for such improvement, provided that if the improvement over and above the functional equivalency of what existed before results in a proposed expenditure in excess of 5 percent of the annual budget, the Board, on receipt of a written petition by Unit Owners with 20 percent of the votes of the Association, within 14 days after the Board's action to approve such expenditure, shall call a special meeting of Unit Owners within 30 days after its receipt of such petition. Unless a majority of the total votes of the Unit Owners are cast at this special meeting to reject the expenditure, the Board's decision to make the expenditure is ratified.

Section 4. Annual Budget.

a.   Each year, on or before November 1st, the Board shall estimate the annual budget of Common Expenses (Annual Budget), including the total amount required for the cost of wages, materials, insurance, services, and supplies that will be required during the ensuing calendar year for the rendering of all services, together with a reasonable amount considered by the Association to be necessary for a reserve for contingencies and replacements (as hereinafter specified) and each Unit Owner's proposed Common Expense assessment, together with an indication of which portions of the Annual Budget are intended for capital expenditures or repairs or payment of real estate taxes. The Board shall deliver a copy of the proposed Annual Budget to each Unit Owner at least thirty (30) days before the adoption thereof. The Association shall give Unit Owners notice

as provided in Article III, Section 4, of the Bylaws of the meeting of the Board, at which the Board proposes to adopt the Annual Budget, or at which any increase or establishment of any assessment, regular or special, is proposed to be adopted.

b. If said Annual Budget proves inadequate for any reason, including nonpayment of any Unit Owner's assessment, or any nonrecurring Common Expense or any Common Expense not set forth in the Annual Budget as adopted, the Board may at any time levy a further assessment, which shall be separately assessed to the Unit Owners according to each Unit Owner's percentage of ownership in the Common Elements, and which may be payable in one lump sum or such installments as the Board may determine. The Board shall serve notice of such further assessment on all Unit Owners (as provided in Article III, Section 4, of the Bylaws) by a statement in writing, giving the amount and reasons therefor, and such further assessment shall become effective and shall be payable to such time or times as determined by the Board. All Unit owners shall be obligated to pay the further assessment.

c. If an adopted Annual Budget or any special assessment requires assessment against Unit Owners in any year exceeding 115% of the assessments (both regular and special, if any) for the preceding year, the Board, on written petition by Unit Owners representing 20% of the votes of the Association delivered to the Board within 14 days of the Board action, shall call a meeting of the Unit Owners within 30 days of the date of delivery of the petition to consider the budget or special assessment. Unless a majority of the votes of the Unit Owners are cast at a meeting to reject the budget or special assessment, it is ratified. In determining whether special assessments, together with regular assessments, exceed 115% of similar assessments in the preceding year, any separate assessment for expenditures relating to emergencies or mandated by law shall not be included in the computation, and the Board may approve such assessment without the right of Unit Owner veto set forth in this paragraph. As used herein, "emergencies" mean an immediate danger to the structural integrity of the Common Elements or to the life, health, safety, or property of the Unit Owners.

d. The Annual Budget shall be assessed to the Unit Owners according to each Unit Owner's percentage of ownership in the Common Elements. Each Unit Owner shall be obligated to pay to the Association, or as it may direct, the portion of the Annual Budget assessed to such Owner in equal monthly installments (subject to acceleration as hereinafter provided) on or before January 1st of the ensuing year, and the 1st day of each and every month of said year. Notwithstanding the foregoing, assessments will not begin until such time as the Developer elects to stop paying all Association expenses; provided, however, that the Board will begin assessing all Unit Owners, if and when a request is made therefor by FHLMC, FNMA, HUD, FHA, or VA.

e. The failure or delay of the Association to prepare or serve the Annual Budget on the Unit Owners shall not constitute a waiver or release in any manner of the Unit Owners' obligation to pay the maintenance and other costs and necessary Reserves, as herein provided, whenever the same shall be determined, and in the absence of any annual or adjusted budget, the Unit Owners shall continue to pay the monthly assessment charges at the then-existing monthly rate established for the previous period until the monthly assessment payment that is due more than ten (10) days after such new annual Budget shall have been mailed.

f. Anything herein or in the Declaration to the contrary notwithstanding, the Board may charge to fewer than all Unit owners such portion of the insurance premium for insurance the

Association is required or permitted to obtain that reflects increased charges for coverage on the Units owned by such Unit Owners, on such reasonable basis as the Board shall determine. Such charge shall be considered a common expense with respect to the Units owned by such Unit Owners for all purposes herein and under the Declaration.

g. All funds collected hereunder shall be held and expended solely for the purposes designated herein, and (except for such special assessments as may be levied hereunder against less than all the Unit Owners and for such special adjustments as may be required to reflect delinquent or prepaid assessments) shall be deemed to be held for the benefit, use, and account of all the Unit Owners in their relative percentages of ownership interest in the Common Elements.

Section 5. Annual Accounting.

a. On or before the 1st day of November of each calendar year commencing 2007, the Association shall supply to all Unit Owners an itemized accounting of the Common Expenses for the preceding calendar year actually incurred and paid, together with an indication of which portions of the Annual Budget were for capital expenditures or repairs or payment of real estate taxes, and with a tabulation of the amounts collected pursuant to the budget or assessment, and showing the net excess or deficit of income over expenditures plus Reserves. Any amount accumulated in excess of the amount required for actual expenses and Reserves shall be credited according to each Unit Owner's percentage of ownership in the Common Elements to the next monthly installments due from Unit Owners under the current year's Annual Budget, until exhausted, and any net shortage shall be added, according to each Unit Owner's percentage of ownership of the Common Elements, to the installments due in the succeeding six months after rendering of the accounting.

b. The Association shall allow any First Mortgagee to examine the books and records of the Association during reasonable business hours and to receive, on request, annual reports and other financial data prepared by the Association, or at its direction.

c. The Association shall provide an audited financial statement for the preceding fiscal year within one-hundred-twenty (120) days after the end of such fiscal year on submission of a written request by any holder, insurer, or guarantor of a first mortgage secured by a Unit.

Section 6. Reserves.

a. The Association shall build up and maintain a reasonable Reserve for operations, contingencies, and replacement. To establish such Reserve, the Developer shall collect from each Unit Owner, on conveyance by the Trustee of a Unit to such Unit Owner, an amount equal to one sixth of the Annual Budget as initially established by the Developer for the first year following the first annual meeting of the members, and shall remit such amount to the Association. Extraordinary expenditures not originally included in the Annual Budget that may become necessary during the year shall be charged first against such Reserve. In addition, the Association or the Board shall have the right to segregate all or any portion of the Reserve for any specific replacement or contingency on such conditions as the Association or the Board deems appropriate. On or before the day of the first annual meeting of members, the Developer shall pay for each Unit then owned by the Trustee such Unit's percentage interest multiplied by one sixth of the Annual Budget as initially established by the Developer for the first year following the first

Page 14 of 19

annual meeting of members. When such Units are later sold, the Developer may collect from the purchasers of such Units sufficient funds to reimburse itself for the funds paid at the time of the first annual meeting of the members. The Developer may not use any of the Reserves to defray any of its expenses or make up any budget deficits while the Developer is in control of the Association.

b. The Annual Budget shall provide for reasonable Reserves for capital expenditures and deferred maintenance for repair or replacement of the Common Elements. To determine the amount of Reserves appropriate for the Association, the Board shall take into consideration the following: (1) the repair and replacement cost and the estimated useful life of the property the Association is obligated to maintain, including but not limited to structural and mechanical components, surfaces of the Building and Common Elements, and energy systems and equipment; (2) the current and anticipated return on investment of Association funds; (3) any independent professional reserve study the Association may obtain; (4) the financial impact on Unit Owners, and the market value of the Units, of any assessment increase needed to fund Reserves; and (5) the ability of the Association to obtain financing or refinancing. Anything to the contrary in the foregoing notwithstanding, the Association may elect to waive in whole or in part the Reserve requirements of this section by a vote of not less than 67% of the total votes of the Association. In the event the Association elects to waive all or part of the Reserve requirements of this section, such fact must be disclosed after the meeting at which such waiver occurs by the Association in the financial statements of the Association and, highlighted in bold print, in the response to any request of a prospective purchaser for the information prescribed under §22.1 of the Act, and no member of the Board or the managing agent of the Association shall be liable, and no cause of action may be brought for damages against these parties, for the lack or inadequacy of Reserve funds in the Annual Budget. If the Association elects to waive all or part of such Reserve requirements, the Association may by a vote of not less than 67% of the total votes of the Association elect to again be governed by the Reserve requirements of this section.

Section 7. Default in Payment.

a. If a Unit Owner is in default in the monthly payment of the aforesaid charges or assessments for thirty (30) days, the Association may assess a service charge of up to 4% of the balance of the aforesaid charges and assessments for each month, or part thereof, that the balance, or any part thereof, remains unpaid. The Association may bring suit for and on behalf of itself, and as representative of all Unit Owners, to enforce collection thereof, or to foreclose the lien therefor as provided by law; and there shall be added to the amount due the costs of said suit, together with legal interest and reasonable attorneys' fees to be fixed by the court. In addition, the Association may also take possession of such defaulting Unit Owner's interest in the Property and maintain an action for possession of the Unit in the manner provided by law. No Unit Owner may waive or otherwise escape liability for the assessments provided for herein by nonuse of the Common Elements or abandonment of his Unit.

b. Each such assessment, together with interest, court costs, late charges, and reasonable attorneys' fees and costs of collections, or the amount of any unpaid fine, shall also be the personal obligation of the person who was the Unit Owner at the time the assessment fell due. The personal obligation for delinquent assessments shall not pass to successors in title or interest unless assumed by them or required by applicable law.

Section 8. Books of Account and Statement of Account.

a.   The Association shall keep full and correct books of account, which shall be open for inspection by any Unit Owner, or any representative of a Unit Owner duly authorized in writing, at such reasonable time or times during normal business hours as may be requested by the Unit Owner. All funds collected hereunder shall be held and expended solely for the purposes designated herein, and (except for such special assessments as may be levied hereunder against less than all the Unit Owners and for such special adjustments as may be required to reflect delinquent or prepaid assessments) shall be deemed to be held for the benefit, use, and account of all the Unit Owners in their relative percentages of ownership interest in the Common Elements.

b.   Upon ten (10) days' notice to the Association and the payment of a reasonable fee fixed by the Association not to exceed Fifteen Dollars ($15), any Unit Owner shall be furnished a statement of his account setting forth the amount of any unpaid assessments or other charges due and owing from such Unit Owner.

Section 9. Other Powers and Duties. The Association may number and assign to any Unit Owner the exclusive privilege to use for storage purposes any portion of the Property designated for such purposes; provided, however, that the Association shall have the right of access to all such storage spaces that contain pipes or other portions of the Common Elements that the Association has the duty or right to maintain, repair, or replace. Any such designation by the Association shall not thereafter be changed except on the affirmative vote of a majority of the Unit Owners. All property stored in any storage area shall be at the sole risk of the respective Unit Owner who has the privilege to use it, and neither the Association nor any other Unit Owner shall be considered a bailee, or otherwise responsible therefor.

## ARTICLE VII
### Contracts, Checks, Deposits, and Funds

Section 1. Contracts. The Board may authorize any officer or officers or agent or agents of the Association, in addition to the officers so authorized by these Bylaws, to enter into any contract or execute and deliver any instrument in the name of and on behalf of the Association, and such authority may be general or confined to specific instances.

Section 2. Checks, Drafts, etc. All checks, drafts, or other orders for the payment of money, notes, or other evidences of indebtedness issued in the name of the Association shall be signed by such officer or officers or agent or agents of the Association, and in such manner as shall from time to time be determined by resolution of the Association. In the absence of such determination by the Association, such instruments shall be signed by the Treasurer and countersigned by the President of the Association.

Section 3. Deposits. All funds of the Association shall be deposited from time to time to the credit of the Association in such banks, trust companies, or other depositaries as the Board may select.

Section 4. Gifts. The Board may accept on behalf of the Association any contribution, gift, bequest, or devise for the general purposes or for any special purpose of the Association.

## ARTICLE VIII
### Books and Records

Section 1. Maintaining Books and Records. The Association shall keep correct and complete books and records of account, and shall also keep minutes of the proceedings of its members, the Board, and committees having any of the authority of the Board.

Section 2. Availability for Examination. The manager or Board shall maintain the following records of the Association available for examination and copying at convenient hours of weekdays by the Unit Owners or their mortgagees and their duly authorized agents or attorneys:

a. Copies of the recorded Declaration and Bylaws and any amendments thereto, Articles of Incorporation of the Association if incorporated, annual reports if unincorporated, and any rules and regulations adopted by the Association or the Board; before the first annual meeting of members of the Association, the Developer shall maintain and make available for examination and copying the records set forth in this subsection a.

b. Detailed accurate records in chronological order of the receipts and expenditures affecting the Common Elements, specifying and itemizing the maintenance and repair expenses of the Common Elements and any other expenses incurred, and copies of all contracts, leases, or other agreements entered into by the Association.

c. The minutes of all meetings of the Association and the Board, which shall be maintained for seven years.

d. A record giving the names and addresses of the members entitled to vote.

e. Ballots and proxies related thereto for all elections to the Board and for any other matters voted on by the Unit Owners, which shall be maintained for not less than one year; provided, however, that in the event the Association adopts rules for secret ballot election as provided in the Act, then, unless directed by court order, only the voting ballot excluding the Unit number shall be subject to inspection and copying.

f. Such other records of the Association as are available for inspection by members of a not-for-profit corporation pursuant to the General Not For Profit Corporation Act of 1986 of the State of Illinois, as amended.

A reasonable fee covering the direct out-of-pocket cost of providing such information and copying may be charged by the Association or the Board for the cost of providing such information and copying.

## ARTICLE IX
### Fiscal Year

The fiscal year of the Association shall begin on the first day of January and end on the last day of December.

## ARTICLE X
### Seal

If the Association is incorporated, the Board shall provide a corporate seal, which shall be in the form of a circle and shall have inscribed thereon the name of the Association and the words "Corporate Seal, Illinois."

## ARTICLE XI
### Waiver of Notice

Whenever any notice whatsoever is required to be given under the provisions of the General Not For Profit Corporation Act of 1986 of the State of Illinois or under the provisions of the Articles of Incorporation or Bylaws of the Association or the Declaration, a waiver thereof (subject to all the provisions of such instruments) in writing signed by the person or persons entitled to such notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice.

## ARTICLE XII
### Amendments to Bylaws

These Bylaws may be altered, amended, or repealed and new Bylaws may be adopted on the affirmative vote of 67% of all of the members at a regular meeting, or at any special meeting called for such purpose, by recording an instrument in writing setting forth such alteration, amendment, or repeal that is signed and acknowledged by an authorized member of the Board and that contains an affidavit by an officer of the Association certifying that the necessary affirmative vote of the members of the Association has been obtained.

## ARTICLE XIII
### Liability of Board Members and Officers; Indemnification

Neither the director nor the officers of the Association shall be liable to the Association or the Unit Owners for any mistake of judgment, or for any other acts or omissions of any nature whatsoever, as such director and officers, except for any acts or omissions found by a court to constitute gross negligence or fraud. The Association shall defend, indemnify, and hold harmless any person who was or is a party, or is threatened to be made a party, to any threatened, pending or completed action, suit, or proceeding, whether civil, criminal, administrative, or investigative (other than an action by or in the right of the Association) by reason of the fact that he is or was a director or officer of the Association, against expenses (including attorneys' fees), judgments,

fines, and amounts paid in settlement actually and reasonably incurred by him in connection with such action, suit, or proceeding if he acted in good faith and in a manner he reasonably believed to be in, or not opposed to, the best interests of the Association, and, with respect to any criminal action or proceeding, had no reasonable cause to believe his conduct was unlawful. The termination of any action, suit, or proceeding by judgment, order, settlement, conviction, or plea of nolo contendere or its equivalent shall not, of itself, create a presumption that the person did not act in good faith and in a manner that he reasonably believed to be in or not opposed to the best interests of the Association, and, with respect to any criminal action or proceeding, had reasonable cause to believe that his conduct was unlawful.

Expenses incurred in defending a civil or criminal action, suit, or proceeding may be paid by the Association in advance of the final disposition of such action, suit, or proceeding, as authorized by the Board in the specific case, on receipt of an undertaking by or on behalf of the director or the officer of the Association to repay such amount, unless it shall ultimately be determined that he is entitled to be indemnified by the Association as authorized in this Article. The sums necessary to discharge the obligations of the Association under this Article shall be Common Expenses.

The indemnification provided by this Article shall not be deemed exclusive of any other rights to which those seeking indemnification may be entitled under any statute, agreement, vote of members of the Association or disinterested directors, or otherwise, both as to action in his official capacity and as to action in other capacity while holding such office, and shall continue as to a person who has ceased to be a director or an officer of the Association. Directors appointed by the Developer, and officers elected by directors appointed by the Developer, shall be entitled to all the protections of this Article.

## ARTICLE XIV
### Construction

a.  Nothing hereinabove contained shall in any way be construed as altering, amending, or modifying the Declaration. The Declaration and these Bylaws shall always be construed to further the harmonious, beneficial, cooperative, and proper use and conduct of the Property. If there is any inconsistency or conflict between these Bylaws and the aforesaid Declaration, the provisions of the Declaration shall control.

b.  All words and terms used herein that are also used in the Declaration shall have the same meaning as provided for such words and terms in the Declaration.

c.  In the event the Association is incorporated, the words "Board of Directors" and "Director" shall be substituted for the words "Board" and "Member of the Board," respectively, wherever they appear herein.

# EXHIBIT

# ATTACHED TO

■■■■■■■■■■■■■■■■■■■■■■■■■■■■

44 PS
5 EX
———
49

# DOCUMENT

# SEE PLAT INDEX

49 PS.

**WELLINGTON & PULASKI CONDOMINIUM ASSOCIATION, INC.**

an Illinois Homeowners' Association

---

**Disclosure pursuant to the Illinois Condominium Property Act**          **(765 ILCS 605/22.1)**

**DATE: May 11, 2015**

**In Re: 2956 N Pulaski Road, Unit 2, Chicago, IL 60641**

**To:   Mr. George Pitsilos**
    **4005CHI LLC        (2956 N Pulaski, Unit #2)**

**22.1 (a)(1)** - Pursuant to the Declaration, By Laws and Rules and Regulations of the Association, a $250.00 fee is due the Association for the production of the Declaration, Bylaws, Rules and Regulations and Resale Packet of the Association. *The Association is not required to provide any documentation to any Unit Owner absent a written request accompanied by the payment of the fee.*

**22.1 (a)(2) - Liens pursuant to Section 9 of the IL Condo Property Act**

> The Association has filed a continuing lien against all Units, recorded as CCRD document # 10-15813036.

> The Association does not issue lien waivers / estoppel certificates / paid assessment letters, by whatever name they may be referred, without receipt of payment in full. For purposes of resale of a Unit, a Unit Owner may request, in writing, a copy of a specific Unit Ledger for presentation to a title company or other closing agent retained for the contemplated transaction. The Association's attorney or other representative will forward to a title company or other closing agent, within 24 hours of the proposed closing date, an unsigned paid assessment letter updated for the proposed closing date reflecting all outstanding debts owed the Association by the selling Unit Owner. Upon receipt of good funds for the total debt owed the Association by the selling Unit Owner, the authorized attorney, agent or director/officer of the Association will execute the document.

> The buyer will be required to make payment at closing in the amount of 3 times the monthly regular assessment charge levied against the Unit, which will be credited to the Statement of Account of the Unit.

**22.1(a)(3) -  Statement of Capital Expenditures anticipated by the Association 2014 - 2016**

> The Association has budgeted for a sum of $218,700.00 for fiscal year 2015 (Feb. 1, 2015 through January 31, 2016) for expenses related to capital improvements.

> It is likely that there may be an additional deficit assessment due to foreclosure actions during the 2009 through 2014 fiscal years involving one or more Units within the Association. The Association is not able to accurately determine the associated costs at this



PLAINTIFF'S
EXHIBIT

**WELLINGTON & PULASKI CONDOMINIUM ASSOCIATION**, INC.

an Illinois Homeowners' Association

time, however, it is likely that a deficit assessment may exceed $50,000.00.

In addition, the Association is involved in litigation with the City of Chicago germane to alleged building code compliance. The current budget has already accounted for the reasonable expenses germane to this litigation, however, it is possible that additional funds may be needed for unanticipated expenses related to building repairs and litigation expenses.

## 22.1(a)(4) - Statement of Reserves

The Association does not currently maintain a reserve fund. It is anticipated by the Board that a "Reserve Fund Study" will be conducted during 2015 and, if adopted, implemented in the 2016 Annual Budget. It is reasonable to assume that the amount of the Reserve, if adopted, will equal or exceed a sum of $100,000.00.

## 22.1(a)(5) - Statement of Financial Condition

The Association has not budgeted for the preparation of financial statements by an outside contractor for the current fiscal year. No independent statement of financial condition currently exists. Per the Declaration and By Laws, a mortgagee may request an audited financial statement upon payment of the fees for preparation.

## 22.1(a)(6) - Pending Litigation and/or Judgments

1) **A mechanics lien was recorded against all Units of the Association by a Manuel Olivera as document # 13-18316088. The Association denies that any sums of money are due and owing Mr. Olivera and avers that the Association possesses affirmative defenses and counter-claims against Mr. Olivera.** The Association is representing ALL Unit owners in this matter and indemnifies each Unit owner of the Association. **The Association is represented by attorney Jonathan Schlange in this matter.**

**The Association has made demand upon the alleged lienor in accordance with Section 34 of the Illinois Mechanic's Lien Act as follows. (770 ILCS 60/34) (from Ch. 82, par. 34)** The lienor failed to respond in the required time. A suit for quiet title and alleging slander of title is being prepared.

## Sec. 34. Notice to commence suit.

(a) Upon written demand of the owner, lienor, or any person interested in the real estate, or their agent or attorney, served on the person claiming the lien, or his agent or attorney, requiring suit to be commenced to enforce the lien or answer to be filed in a pending suit, suit shall be commenced or answer filed within 30 days thereafter, or the lien shall be forfeited. Such service may be by registered or certified mail, return receipt requested, or by personal service.

(b) A written demand under this Section must contain the following language in at least 10

**WELLINGTON & PULASKI CONDOMINIUM ASSOCIATION**, INC.

an Illinois Homeowners' Association

point bold face type: "Failure to respond to this notice within 30 days after receipt, as required by Section 34 of the Mechanics Lien Act, shall result in the forfeiture of the referenced lien."      (Source: P.A. 97-1165, eff. 2-11-13.)

## 2) City of Chicago vs. Coppola, et. al.   (2011-M1-400718)

The City of Chicago has filed litigation against ALL unit owners of the Association seeking fines, fees and costs for various alleged building code violations. The litigation has been active since March 2011. The Association and several owners have filed motions to vacate on various affirmative defenses including lack of jurisdictional standing, lack of alleged code violations and a number of other common law and statutory defenses available. It is likely that this litigation will continue into the 2015 and possibly 2016 calendar years. The Board is currently considering whether to raise several counter claims against the City and whether to seek to remove the litigation to the U.S. District Court for the Northern District of Illinois.

## 3) Community Initiatives, Inc. - TBI Urban Holdings, LLC.

A receivers' lien was recorded by Community Initiatives Inc on September 5, 2014 in the amount of $8,931.67. Community Initiatives assigned the lien to TBI Urban Holdings, LLC, a wholly owned subsidiary of Community Initiatives. TBI has initiated an action seeking to foreclose the lien (2015 CH 2654).

The Board disputes the validity of the lien and is preparing suit for slander of title, RICO, various civil rights violations and violations of various state and federal statutes.

## 4) Barry Kriesler

A default judgment was entered in favor of Barry Kriesler in 13-M1-144672 in the amount of 13,662.21 alleging unpaid attorneys fees, costs, interest, etc. The Board disputes the debt as a false/inflated claim and is seeking counsel to prepare suit for malpractice.

## 5) Soumar Masonry

A mechanic's lien has been filed against the Association by Soumar Masonry. The Association disputes the workmanship involved and is reviewing the matter with counsel for possible litigation.

22.1(a)(7) -    The Association maintains a $2 million liability policy, a policy for structural loss and catastrophic coverage; directors and officers liability; and excess liability (aka "umbrella").

Each Unit Owner is required to provide a liability policy naming the Association as a co-insured in an amount of not less than $300,000.00 for damages to the common elements and to adjoining Units, including the cost of the deductible.

**WELLINGTON & PULASKI CONDOMINIUM ASSOCIATION**, INC.

an Illinois Homeowners' Association

### 22.1(a)(8) -    Statement of Unit Compliance

The Association **DOES NOT** believe that UNIT 2956 #2 is in compliance with the requirements of the Declaration, By Laws or Rules & Regulations of the Association at this time in that:

**There are known building code deficiencies**, specifically, the HVAC system is not compliant with current City of Chicago Heating/Ventilation codes and there may have been structural work done within the Unit without either a permit or an architect/engineers plans as required by the City of Chicago Building Code. There may also be minor plumbing and electrical corrections needed.

### 22.1(a)(9) -    The correct address of the Association for legal service is:

Wellington Pulaski Condominium Association
Attn: Association Secretary
c/o Provest DE II, Inc., Registered Agent
161 N Clark Street, 47th Floor, Chicago Title Building
Chicago, Illinois 60601

Phone/Fax: (312) 470-6321
E-mail: wellingtonpulaski@gmail.com

### Reservation of Right of First Refusal

The Association retains the first right of refusal on the sale of all Units.

Fwd: Wellington Condominium Association- 2956 North Pulaski Ave...          https://mail.aol.com/webmail-std/en-us/PrintMess

George Somer

President

for

Wellington & Pulaski Condominium Association


cc: Board file



On Mon, Jul 27, 2015 at 9:15 AM, Pamela Visvardis <pamela@relawchicago.com> wrote:

Wellington Pulaski Condo Association Board Members,


As you are all aware, I represent both owners of Chi4005 LLC, the owner of 2 units in your association. I have contacted you on over FIVE separate occasions in an attempt to obtain both a 22.1 Disclosure Statement (updated) and Paid Assessment letter for my client's units. Since you have literally ignored all my attempts, my client decided to attempt to deal with you one on one. You have, once again, been giving him the run around and making statements that the Board will be exercising its right of first refusal and purchasing the units.


This is now the FOURTH set of purchase contracts for my client's 2 units that the Board is sabotaging. The Board refuses to produce updated 22.1 Disclosure Statements and Paid Assessment letters, even though it is statutorily required to do so. The Board is literally holding my client hostage in this situation. You have failed to respond to any of my emails, calls, or certified letters.


I am now requesting an updated 22.1 Disclosure Statement for Both of my client's units as well as Paid Assessment Letters good through the End of August. If we do not receive these documents by July 31, 2015, you will leave us no choice but to file suit against the Board, and name each of the Board members as Defendants individually, for fraud, breach of fiduciary duty, among others.



Kind regards,
Pamela

Pamela Visvardis
RE Law Chicago
Attorneys & Counselors at Law
2220 West North Avenue
Chicago, Illinois 60647
o (312) 850-2622


PLAINTIFF'S EXHIBIT
Ex 3

Case 15-00786   Doc 11-2   Filed 11/25/15   Entered 11/25/15 11:39:20   Desc Exhibit
Exhibit III   Part 1   Page 51 of 59
Fwd: Wellington Condominium Association- 2956 North Pulaski Ave...

https://mail.aol.com/webmail-std/en-us/PrintMessa

f (312) 850-2623

http://www.relawchicago.com

This message (including any attachments) contains confidential information
intended for a specific individual and purpose, and is protected by law. If you are not
the intended recipient, you should delete this message. Any disclosure, copying, or
distribution of this message, or the taking of any action based on it, is strictly
prohibited.

----- Forwarded Message -----
**From:** Pamela Visvardis <pamela@relawchicago.com>
**To:** Wellington Pulaski Condominium Association <wellingtonpulaski@gmail.com>
**Cc:** John Campas <john.campas@dreamtown.com>
**Sent:** Thursday, May 7, 2015 1:55 PM
**Subject:** Re: Wellington Condominium Association- 2956 North Pulaski Avenue, Unit 2S and 4005 W. Wellington
#3 - Chi 4005, LLC

Board of Wellington Pulaski,

This is my FINAL ATTEMPT to contact you to provide updated 22.1 Disclosure statement and Paid
Assessment letter for my clients properties, 2956 North Pulaski Avenue, Unit 2S and 4005 W.
Wellington #3.  You have refused to even respond to any of my emails, voicemails, and letters.  Your
unprofessional and deceptive actions, which are in clear violation of Illinois Statute, have caused my
client to lose over 3 potential purchasers for the units.

Currently there is an investor interested in purchasing BOTH units.  Based on this we are requesting
the 22.1 Disclosure Statement and Paid Assessment Letter for 2956 North Pulaski Avenue, Unit 2S
and 4005 W. Wellington #3.  Please provide IMMEDIATELY

Kind regards,
Pamela

Fwd: Wellington Condominium Association- 2956 North Pulaski Ave...                    https://mail.aol.com/webmail-std/en-us/PrintMessag

<u>Pamela Visvardis</u>
<u>RE Law Chicago</u>
<u>Attorneys & Counselors at Law</u>
<u>2220 West North Avenue</u>
<u>Chicago, Illinois 60647</u>
<u>o (312) 850-2622</u>
<u>f (312) 850-2623</u>

<u>http://www.relawchicago.com</u>

This message (including any attachments) contains confidential information
intended for a specific individual and purpose, and is protected by law. If
you are not the intended recipient, you should delete this message. Any
disclosure, copying, or distribution of this message, or the taking of any
action based on it, is strictly prohibited.

**From:** Pamela Visvardis <<u>pamela@relawchicago.com</u>>
**To:** Wellington Pulaski Condominium Association <<u>wellingtonpulaski@gmail.com</u>>
**Cc:** Robert Lattas <<u>bob@relawchicago.com</u>>; John Campas <<u>john.campas@dreamtown.com</u>>
**Sent:** Monday, April 27, 2015 3:18 PM
**Subject:** Wellington Condominium Association- 2956 North Pulaski Avenue, Unit 2S - Chis 4005, LLC

Board of Wellington Pulaski,

As you are well aware, I represent unit owner CHI 4005 LLC. This is the FIFTH REQUEST for a 22.1 disclosure statement and
Paid assessment letter for my client's unit. The board has been COMPLETELY UNRESPONSIVE.

We currently have a new Purchaser who is willing and able to close immediately. Should this Property be sold, my client will pay
the outstanding special assessment at closing. Please find new contract attached.

As an Association, you are required to provide the 22.1 Disclosure statement and Paid assessment letter to my client upon
request. Pursuant to 765 ILCS 605/22.1 (b), "The principal officer of the unit owner's association or such other officer as is
specifically designated shall furnish the above information when requested to do so in writing and within **30 days of the
request."** I have been requesting a 22.1 disclosure statement from you and a paid assessment letter from you for MONTHS.
You are clearly outside the statutorily mandated time period to provide these documents.

Fwd: Wellington Condominium Association- 2956 North Pulaski Ave...                    https://mail.aol.com/webmail-std/en-us/PrintMessag

Not only have you failed to provide them, but you have not responded to ANY of my FIVE emails and multiple voicemails. My client has been extremely patient, as this is the Third purchase contract for this unit and the Association has been impossible to deal with throughout. **It would be ridiculous to force my client to initiate litigation to obtain documents that the Association is required to provide, however, my client is prepared to file suit to obtain the documents if required.** I hope to hear from the Board and obtain the documents immediately.

Kind regards,
Pamela

Pamela Visvardis
RE Law Chicago
Attorneys & Counselors at Law
2220 West North Avenue
Chicago, Illinois 60647
o (312) 850-2622
f (312) 850-2623

http://www.relawchicago.com

This message (including any attachments) contains confidential information intended for a specific individual and purpose, and is protected by law. If you are not the intended recipient, you should delete this message. Any disclosure, copying, or distribution of this message, or the taking of any action based on it, is strictly prohibited.

\-
\-
\-

--
Kind regards,
Pamela

Pamela Visvardis
RE Law Chicago
Attorneys & Counselors at Law
2220 West North Avenue
Chicago, Illinois 60647
o (312) 850-2622
f (312) 850-2623
http://www.relawchicago.com



## LLC FILE DETAIL REPORT

| | | | |
|---|---|---|---|
| **Entity Name** | CHI4005 L.L.C. | **File Number** | 04372387 |
| **Status** | ACTIVE | **On** | 06/30/2015 |
| **Entity Type** | LLC | **Type of LLC** | Domestic |
| **File Date** | 05/16/2013 | **Jurisdiction** | IL |
| **Agent Name** | FLORES, MARTIN | **Agent Change Date** | 09/21/2015 |
| **Agent Street Address** | 2103 N PULASKI RD | **Principal Office** | 2103 NORTH PULASKI ROAD CHICAGO, IL 606390000 |
| **Agent City** | CHICAGO | **Management Type** | MGR  View |
| **Agent Zip** | 60639 | **Duration** | PERPETUAL |
| **Annual Report Filing Date** | 06/30/2015 | **For Year** | 2015 |
| **Series Name** | NOT AUTHORIZED TO ESTABLISH SERIES | | |

Return to the Search Screen

Purchase Certificate of Good Standing

(One Certificate per Transaction)

BACK TO CYBERDRIVEILLINOIS.COM HOME PAGE



*File Number*        6542-907-1



# STATE OF ILLINOIS
## OFFICE OF
## THE SECRETARY OF STATE

## To all to whom these Presents Shall Come, Greeting:

*I, Jesse White, Secretary of State of the State of Illinois, do hereby certify that I am the keeper of the records of the Department of Business Services. I certify that*

ATTACHED HERETO IS A TRUE AND CORRECT COPY, CONSISTING OF 4 PAGE(S), AS TAKEN FROM THE ORIGINAL ON FILE IN THIS OFFICE FOR WELLINGTON & PULASKI CONDOMINIUM ASSOCIATION, INC..



**PLAINTIFF'S EXHIBIT**
**B.1**

## In Testimony Whereof, *I hereto set my hand and cause to be affixed the Great Seal of the State of Illinois, this* 4TH *day of* SEPTEMBER *A.D.* 2015 .

*Jesse White*

SECRETARY OF STATE

Authentication #: 1524702127 verifiable until 09/04/2016.
Authenticate at: http://www.cyberdriveillinois.com

FORM **NFP 102.10** (rev. Dec. 2003)
**ARTICLES OF INCORPORATION**
General Not For Profit Corporation Act

Jesse White, Secretary of State
Department of Business Services
Springfield, IL 62756
217-782-9522
www.cyberdriveillinois.com

‖‖‖‖‖‖‖‖‖‖‖  of a cashier's
                    y order or
CP0587654          check

**JESSE WHITE - SECRETARY OF STATE** Filed: 03/02/2007

File # **6542-907-1**      Filing Fee: $50   Approved: _____ **JR**

———— Submit in duplicate ———— Type or Print clearly in black ink ———— Do not write above this line ————

**Article 1.**  Name of Corporation: <u>Wellington & Pulaski Condominium Association, Inc.</u>

**Article 2.**  Name and Address of Initial Registered Agent and Registered Office:

Registered Agent <u>Carl P. Palladinetti</u>
                          First Name                    Middle Name                    Last Name

Registered Office <u>4024 W. Montrose Avenue</u>
                          Number        Street                         Suite No. (P.O. Box alone is unacceptable)

<u>Chicago</u>                    IL   <u>60641</u>                    <u>Cook</u>
        City                              ZIP Code                        County

**Article 3.**  The first Board of Directors shall be <u>three (3)</u> in number, their Names and Addresses being as follows:
                                                        Not less than three

| Director Name | Street Address | City | State | ZIP Code |
|---|---|---|---|---|
| Monica Binciguerra | 3106 N. Cicero Avenue, #100 | Chicago | Illinois | 60641 |
| Hector Rodriguez | 3106 N. Cicero Avenue, #100 | Chicago | Illinois | 60641 |
| Hugo Blanco | 3106 N. Cicero Avenue, #100 | Chicago | Illinois | 60641 |

048

**Article 4.**  Purposes for which the corporation is organized:

to operate and maintain a condominium building

(continued on back)

Printed by authority of the State of Illinois. September 2005 – 10M – C 157.14



**Article 4.** (continued)

Is this corporation a Condominium Association as established under the Condominium Property Act? (check one)
☑ Yes  ☐ No

Is this corporation a Cooperative Housing Corporation as defined in Section 216 of the Internal Revenue Code of 1954? (check one)
☐ Yes  ☑ No

Is this corporation a Homeowner's Association, which administers a common-interest community as defined in subsection (c) of Section 9-102 of the Code of Civil Procedure? (check one)
☐ Yes  ☑ No

**Article 5.**  Other provisions (attach additional pages if needed):

**Article 6.   Names & Addresses of Incorporators**
The undersigned incorporator(s) hereby declare(s), under penalties of perjury, that the statements made in the foregoing Articles of Incorporation are true.

Dated  March 1, 2007
        Month & Day                                    Year

**Signatures and Names**                        **Post Office Address**

1. _____           1.  4024 W. Montrose Avenue
   Signature                             Street
   Carl P. Palladinetti, attorney         Chicago, Illinois 60641
   Name (please print)                    City/Town        State        ZIP

2. _____           2. _____
   Signature                             Street

   _____              _____
   Name (please print)                    City/Town        State        ZIP

3. _____           3. _____
   Signature                             Street

   _____              _____
   Name (please print)                    City/Town        State        ZIP

4. _____           4. _____
   Signature                             Street

   _____              _____
   Name (please print)                    City/Town        State        ZIP

5. _____           5. _____
   Signature                             Street

   _____              _____
   Name (please print)                    City/Town        State        ZIP

**Signatures must be in BLACK INK on the original document.**
**Carbon copies, photocopies or rubber stamped signatures may only be used on the duplicate copy.**

- If a corporation acts as incorporator, the name of the corporation and the state of incorporation shall be shown and the execution shall be by a duly authorized corporate officer. Please print name and title under the officer's signature.
- The registered agent cannot be the corporation itself.
- The registered agent may be an individual, resident in Illinois, or a domestic or foreign corporation, authorized to act as a registered agent.
- The registered office may be, but need not be, the same as its principal office.
- A corporation that is to function as a club, as defined in Section 1-3.24 of the "Liquor Control Act" of 1934, must insert in its purpose clause a statement that **it will comply with the State and local laws and ordinances relating to alcoholic liquors.**

(For inserts use 8 1/2 x 11 white paper)

Printed by authority of the State of Illinois. September 2005 – 10M – C 157.14

FORM **NFP 110.30** (rev. Dec. 2003)
**ARTICLES OF AMENDMENT**
General Not For Profit Corporation Act

Jesse White, Secretary of State
Department of Business Services
501 S. Second St., Rm. 350
Springfield, IL 62756
217-782-1832
www.cyberdriveillinois.com

Remit payment in the form of a
check or money order payable
to Secretary of State.

**FILED**

**JUN 9 - 2010**

**JESSE WHITE**
**SECRETARY OF STATE**

CP0320294

File # 6542-907-1          Filing Fee: $25     Approved: _____

———— Submit in duplicate ———— Type or Print clearly in black ink ———— Do not write above this line ————

1. Corporate Name (See Note 1 on back.):  WELLINGTON & PULASKI CONDOMINIUM ASSOCIATION, INC.

2. Manner of Adoption of Amendment:
   The following amendment to the Articles of Incorporation was adopted on DECEMBER 02, 2009 in the man-
   ner indicated below (check one only):
   Month, Day & Year

   ☐ By affirmative vote of a majority of the directors in office, at a meeting of the board of directors, in accordance with
   Section 110.15. **(See Note 2 on back.)**

   ☐ By written consent, signed by all the directors in office, in compliance with Sections 110.15 and 108.45. **(See Note 3
   on back.)**

   ☑ By members at a meeting of members entitled to vote by the affirmative vote of the members having not less than
   the minimum number of votes necessary to adopt such amendment, as provided by this Act, the Articles of
   Incorporation or the bylaws, in accordance with Section 110.20. **(See Note 4 on back.)**

   ☐ By written consent signed by members entitled to vote having not less than the minimum number of votes necessary
   to adopt such amendment, as provided by this Act, the Articles of Incorporation, or the bylaws, in compliance with
   Sections 107.10 and 110.20. **(See Note 5 on back.)**

3. Text of Amendment:
   (a.) When an amendment effects a name change, insert the new corporate name below. Use 3(b.) below for all other
   amendments. "Article 1: The Name of the Corporation is:

**PAID**

**JUN 1 0 2010**

_____
New Name

(b.) All amendments other than name change.
If the amendment affects the corporate purpose, the amended purpose is required to be set forth in its entirety. If
there is not sufficient space to add the full text of the amendment, attach additional sheets of this size.

**DEPARTMENT OF**
**BUSINESS SERVICES**

AMENDMENT TO THE ARTICLES OF INCORPORATION, AS FOLLOWS:

AMENDMENT #1: EFFECTIVE DECEMBER 2, 2009 THE TERM OF OFFICE OF ANY DIRECTOR IS THREE
YEARS FROM THE DATE OF ELECTION. THE BOARD OF DIRECTORS IS AUTHORIZED TO FILL VACANCIES
UNTIL THE NEXT REGULAR MEETING OF THE OWNERS.

AMENDMENT #2: THE PROVISIONS OF THE ELECTRONIC SIGNATURES ACT IS HEREBY ADOPTED.

AMENDMENT #3: THE ANNUAL MEETING OF THE CORPORATION SHALL BE HELD ON THE 2ND TUESDAY
IN THE MONTH OF DECEMBER IN EACH SUCCESSIVE YEAR.

AMENDMENT #4: VOTING PROXIES MUST BE FILED NOT LESS THAN FOURTEEN (14) CALENDAR DAYS
NOR MORE THAN THIRTY (30) CALENDAR DAYS PRIOR TO THE ANNUAL MEETING.

4. The undersigned Corporation has caused these Articles to be signed by a duly authorized officer who affirms, under penalties of perjury, that the facts stated herein are true and correct.

**All signatures must be in BLACK INK.**

Dated  DECEMBER 02          ,  09          **WELLINGTON & PULASKI CONDOMINIUM ASSOCIATIO**
          Month & Day            Year           Exact Name of Corporation

                                12/2/2009
          Any Authorized Officer's Signature

   JAMES REED    VICE PRESIDENT
          Name and Title (type or print)

5. If there are no duly authorized officers, the persons designated under Section 101.10(b)(2) must sign below and print name and title.

   The undersigned affirms, under penalties of perjury, that the facts stated herein are true.

Dated _____ , _____
          Month & Day                   Year

_____          _____
          Signature                              Name and Title (print)

_____          _____
          Signature                              Name and Title (print)

_____          _____
          Signature                              Name and Title (print)

_____          _____
          Signature                              Name and Title (print)

## NOTES

1. State the true and exact corporate name as it appears on the records of the Secretary of State BEFORE any amendment herein is reported.

2. Directors may adopt amendments without member approval only when the corporation has no members, or no members entitled to vote pursuant to §110.15.

3. Director approval may be:
   a. by vote at a director's meeting (either annual or special), or
   b. by consent, in writing, without a meeting.

4. All amendments not adopted under Sec. 110.15 require that:
   a. the board of directors adopt a resolution setting forth the proposed amendment, and
   b. the members approve the amendment.

   Member approval may be:
   a. by vote at a members meeting (either annual or special), or
   b. by consent, in writing, without a meeting.

   To be adopted, the amendment must receive the affirmative vote or consent of the holders of at least two-thirds of the outstanding members entitled to vote on the amendment (but if class voting applies, also at least a two-thirds vote within each class is required).

   The Articles of Incorporation may supersede the two-thirds vote requirement by specifying any smaller or larger vote requirement not less than a majority of the outstanding votes of such members entitled to vote, and not less than a majority within each class when class voting applies. (Sec. 110.20)

5. When member approval is by written consent, all members must be given notice of the proposed amendment at least five days before the consent is signed. If the amendment is adopted, members who have not signed the consent must be promptly notified of the passage of the amendment. (Sec. 107.10 & 110.20)

Printed by authority of the State of Illinois. July 2007 - 10M - C 130.17